## ROYAL HIGHLANDERS v. COMMISSIONER OF INTERNAL REVENUE.
### No. 12621.

Circuit Court of Appeals, Eighth Circuit.

Oct. 25, 1943.

Leonard A. Flansburg, of Lincoln, Neb., (Charles H. Flansburg, of Lincoln, Neb., on the brief), for petitioner.

F. E. Youngman, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SANBORN and RIDDICK, Circuit Judges, and DELEHANT, District Judge.

SANBORN, Circuit Judge.

The questions for decision are: (1) whether the amounts carried by the petitioner, a mutual legal reserve life insurance company of Nebraska, in a "Premium Reduction Credit Reserve" should be included in "the reserve funds required by law" in determining the mean of such funds deductible from gross income under § 203 (a) (2) of the Revenue Acts of 1936 and 1938, 49 Stat. 1648, 52 Stat. 447, 26 U.S. C.A.Int.Rev.Code, § 203(a) (2); and (2) whether the petitioner proved that certain amounts which had been included in gross income in its income tax returns for 1937 and 1938 were the net proceeds from the sale of cattle, and, therefore, not a part of its gross income under § 202(a) of the

Revenue Acts of 1936 and 1938, 26 U.S.C.A. Int.Rev.Code, § 202(a).

The petitioner was organized as a fraternal society or association in 1896. It issued policies or benefit certificates upon the assessment plan until 1930. Its rates for these policies were inadequate. It maintained two funds, an "Expense Fund" in which it set up the portion of the assessments to be used for expenses, and a mortality fund, know as the "Fidelity Fund", which represented the portion of the assessments held to meet its policy liabilities. Although the society was actuarially insolvent, it had an accumulation in its "Fidelity Fund" representing the excess of assessments paid into the fund over claims paid out of it.

The State of Nebraska in 1927 authorized any fraternal society to issue legal reserve policies, provided that it maintained, with respect thereto, reserves required by the American Experience Table of Mortality with an interest assumption of more than four per cent or by some higher standard. Neb. Session Laws 1927, c. 138, page 379. In September, 1929, the petitioner amended its by-laws to provide for the issuance of legal reserve policies (with cash surrender and loan values) called "Ideal Reserve Policies", at the rates and with the reserves required by the American Experience Table of Mortality, with an interest assumption of $3\frac{1}{2}\%$. The amended by-laws provided:

"Any member admitted prior to January 1, 1930, may exchange his present benefit certificate for any other plan, rates for which are based upon the American Experience Table of Mortality and $3\frac{1}{2}\%$, * * *. Such members shall be rated at their attained age, * * *.

"Any member exchanging to a plan in force after January 1, 1930, shall be allowed such reductions in his monthly premium rates as an equitable apportionment of any accumulation resulting from his previous contributions will purchase under the regulations authorized by the Executive Committee. * * * "

In 1930 the petitioner commenced writing legal reserve policies called "Ideal Reserve Policies", and permitted its members to exchange their old assessment certificates for the new policies. The reserve set up with respect to the legal reserve policies was called the "Ideal Reserve Fund". The petitioner determined the actuarial credit of its assessment members in the mortality fund ("Fidelity Fund"). When a member exchanged his benefit certificate for a new legal reserve policy, he was granted the reduction of premium justified by his actuarial credit, and the credit was transferred by the petitioner from the "Fidelity Fund" to the "Ideal Reserve Fund", but was set up in a "Premium Reduction Credit Reserve" account.

During the time that the petitioner remained a fraternal society, it was not subject to Federal income tax. On May 4, 1937, it became a mutual legal reserve life insurance company under the laws of Nebraska, and was thereafter liable for the federal tax imposed upon the income of such life insurance companies. In its income tax returns for the years 1937 and 1938, in calculating the deduction to which it was entitled under § 203(a) (2) of the Revenue Acts of 1936 and 1938, namely $3\frac{3}{4}\%$ "of the mean of the reserve funds required by law and held at the beginning and end of the taxable year,"[1] it included in its "reserve funds required by law" its "Premium Reduction Credit Reserve". The respondent disallowed the deduction of the mean of the "Premium Reduction Credit Reserve" on the ground that it was not a reserve fund required by law. Upon review, the Tax Court, after a hearing, affirmed the Commissioner.

Apparently there is no controversy as to the basic facts, as to the applicable law, or as to what constitutes a life insurance reserve. The question is whether the amounts set up in the "Premium Reduction Credit Reserve" represented money or assets of the petitioner which, under the law of Nebraska, it was required to include in its reserves.

The amount of the reserve which a life insurance company is required to set up

---

[1] "§ 203. Net income of life insurance companies.

"(a) General rule. In the case of a life insurance company the term 'net income' means the gross income less—

\* \* \* \* 

"(2) Reserve funds. An amount equal to 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, except that in the case of any such reserve fund which is computed at a lower interest assumption rate, the rate of $3\frac{3}{4}$ per centum shall be substituted for 4 per centum. \* \* \*"

against its policy liabilities can always be actuarially determined with mathematical accuracy by a valuation of its policies. The reserve on a policy represents the difference between the present value of the future benefits promised the insured and the present value of the future net premiums (the premium specified in the policy less the "loading" for expenses) the insured is to pay. The value of the benefits and the value of future net premiums is never equal except at the instant before the policy becomes effective. At that moment the scales are evenly balanced. With advancing age the value of the future benefits increases, and with the payment of premiums the value of the future net premiums decreases. Therefore, the insurer must maintain a reserve sufficient to equalize the values of what it is to give and what it is to receive, if it is to remain solvent and meet its policy obligation when it matures.

The requirements of the Nebraska law at all the times here material—as is conceded by the parties—relating to the issuance of legal reserve policies by fraternal societies and the exchange therefor of assessment policies, are to be found in Section 44-347 of the Compiled Statutes of Nebraska, Supp.1941.[2] That statute requires any fraternal society issuing legal reserve policies (with cash surrender values) to provide and maintain reserves for their payment "on the basis of the American Experience Table of Mortality with an interest assumption of not more than four per cent, or some higher standard." The statute requires the society to show by an annual valuation made by a competent ac-

---

[2] "44-347. Fraternal, Beneficiary Associations, and Societies, Rights of Members Extended. No company, association or society, other than a legal reserve life insurance company, life association or fraternal beneficiary association or society maintaining reserves on the basis of the American Experience Table of Mortality with an interest assumption of not more than four per cent, or some higher standard shall hereafter give or promise any cash surrender values in its policies whatever, except for the unearned premium. Each accident corporation which has heretofore issued policies providing for a cash surrender value at any given period shall value such policies as pure endowments based upon an experience table and the rate of interest authorized by this article. This reserve shall be in addition to the unearned premium reserve of such a company. Every policy heretofore issued by any other insurance corporation shall be valued either according to the terms of the policy itself or the provisions of this article. Provided, the right of a fraternal beneficiary association or society to pay old age benefits or disability benefits to its members as provided in its rules or by-laws, shall not be affected by the provisions of this Act. And provided further, any fraternal beneficiary association or society may enter into contracts providing for paid up insurance and granting such benefits, as well as cash surrender and loan values, and in favor of such beneficiaries, as its laws may authorize when it shall, for the payment of such benefits and obligations, provide and maintain reserves on the basis of the American Experience Table of Mortality, with an interest assumption of not more than four per cent, or some higher standard. And pro-

vided, further, that fraternal beneficiary associations or societies or life associations, issuing such forms of contracts herein provided for, or granting cash surrender values in any of its certificates or policies, shall show by an annual valuation made by a competent actuary, approved by the Department of Trade and Commerce of this state, that it is accumulating and maintaining as to such certificates or policies the reserves required by the above named mortality table at the interest rate above named or higher standard, as the case may be. Any such fraternal beneficiary association or society or life association shall carry as a liability the reserves so determined and the assets representing such reserves shall be held in trust for such members separate and distinct from assets belonging to members holding certificates or policies on which such reserves are not maintained, and the assets so held in trust shall not be used to pay any claims or benefits upon any certificate or policy to members other than the members for whom such assets are so held in trust. And provided further, that any member of a beneficiary association or society holding a certificate therein and who desires to surrender such certificate in exchange for any other form of certificate issued by such association or society, shall, by taking such new certificate, not lose his accumulated actuarial credit in the funds of the association, but he shall be entitled to the transfer of such funds to the amount of such credit to the funds held for the benefit of such new certificate and shall be entitled to a deduction justified by such credit upon the assessments and payments he shall be required to make for such new certificate."

tuary, approved by the Department of Trade and Commerce of the State, that the society is maintaining, as to such policies, the necessary reserves. The statute requires the society to carry as a liability the reserves so determined and to hold the assets represented by such reserves separate and in trust for the legal reserve policyholders. The statute provides that any member of a fraternal society may exchange his benefit certificate "for any other form of certificate issued by such association or society," and that he shall not thereby "lose his accumulated actuarial credit in the funds of the association, but he shall be entitled to the transfer of such funds to the amount of such credit to *the funds held for the benefit of such new certificate* and shall be entitled to a deduction justified by such credit upon the assessments and payments he shall be required to make for such new certificate." [Italics supplied.]

It is certain that the laws of Nebraska required the petitioner to maintain reserves on the basis of the American Experience Table of Mortality with an interest assumption of $3\frac{1}{2}\%$ with respect to the legal reserve policies issued by it. It is, perhaps, not so certain that the laws required the petitioner to transfer the actuarial credit of one of its members in the "Fidelity Fund" to the "Ideal Reserve Fund" when that member exchanged his certificate for a legal reserve policy. It would seem, however, that, by necessary implication, such a transfer was required for the reason that the credit must be "held for the benefit of" the new policy, although used to purchase a reduction of premium, and, unless the credit was transferred to the reserve, there would be an immediate impairment of the reserve required, since the present value of the future benefits would, at the inception of the policy, exceed the present value of the future reduced net premiums.

We think, however, that the important question is whether the reserves, including the "Premium Reduction Credit Reserve", set up by the petitioner against its policy liabilities were in excess of the reserve requirements of the laws of Nebraska. In other words, did the reserves carried exceed those required by the American Experience Table of Mortality with an interest assumption of $3\frac{1}{2}\%$? If the reserves set up were not excessive, then they were "reserves required by law."

At the hearing before the Tax Court, Mr. B. B. Gribble, who, for about fifteen years, had been the actuary of the Department of Insurance of the State of Nebraska, which has supervision of insurance in the state, testified that he was familiar with the petitioner and with the transfers of portions of its "Fidelity Fund" to its reserve fund for the legal reserve policies, when benefit certificates were exchanged for such policies; that it was not only necessary mathematically, but a matter of state law, for the petitioner to hold the amounts so transferred as a part of its reserves "to meet the Ideal Reserve Policies in order to keep the reserves solvent for the purpose of those policies under death risks"; that on the funds transferred for premium reduction credits it is necessary to accumulate interest at $3\frac{1}{2}\%$ in order to create a fund to pay the death risks on the legal reserve policies issued; that the Department of Insurance, in its examinations of the petitioner, has set up the premium reduction credits as a part of the petitioner's reserve and has required the petitioner to set them up in its annual statement at the end of each calendar year; and that the "Premium Reduction Credit Reserve" is a reserve to sustain the policy.

Mr. C. D. Spangler, the actuary of the petitioner, demonstrated, in an exhibit prepared by him and received in evidence, that it was necessary to include the premium reduction credit in the reserve maintained with respect to a legal reserve policy issued in exchange for a benefit certificate, in order to meet the reserve requirements for that policy, and that the reserve would be the same whether the premium reduction credit was treated as having purchased an annuity or as having paid a "single premium for the benefits, less the present value of future net contributions," or as having purchased such fractional part of the face amount of the insurance as the credit would purchase. He also showed that the premium reduction credits were valued as annuities, and that the method used by the petitioner in setting up its reserves separately was for actuarial convenience, "since it enables us to value these policies in groups rather than make separate calculations on individual policies."

Mr. Arthur M. Haight, a consulting actuary of the firm of Haight, Davis & Haight, testified relative to the transfer of premium reduction credits to the legal

reserves required to be maintained for the Ideal Reserve Policies, as follows:

"A. Well, the real crux of the change there was that every policy had a share in the Fidelity Fund. This share was transferred to the Ideal Fund and then from there on the policyholder paid a fixed premium. The sum of those two then,— that is, the amount which was transferred over plus the future premiums equaled the insurance benefit that was granted to that policyholder. So you had really what I think sometimes called for lack of another name, a single premium, annual premium policy, because he was paying in a lump sum for part of his insurance, and then a reduced premium from there on because of the fact that he had paid a little more to begin with. Now, as far as valuation is concerned, reserves could be computed,— perhaps you might say technically computed,—these lump sum payments plus the net value of the future premiums. But the only objection to that is it would involve so much mathematical calculations that it would be terribly expensive and almost insurmountable to overcome, [and] to take those and following with tabulars against those premiums, you would arrive at the same result with a less amount of work.

"Q. In other words, if you calculate the transfers to the reserve for reduction of premiums separately, as a matter of convenience from the tabular reserves, you can save work and arrive at the same result as if you had kept a separate reserve for each policyholder by reason of the transfer to his reserve, is that correct? A. That's correct. The tabular reserve contemplates the further collection of the so-called tabular premium. And in this case you are not going to collect that technically at this time."

Mr. Haight, in an explanatory exhibit introduced in evidence, said: "The next question raised is as to whether or not the so-called premium credit reserve is a proper part of the Reserve Fund. In this connection we wish to state that we believe it is such a part, and furthermore believe no insurance department or actuary could consider it otherwise."

In support of that opinion, he stated: "Again going back to the history of the company and the origin of these credits, it will be noted that these credits originated from the Fraternal Fund, a fund which could not be used for expense purposes. They were transferred to the Ideal Reserve Fund, again a fund which could not be used for expense purposes. The company was obligated to make this transfer by the Nebraska Code and was obligated to maintain the new fund for the same purpose for which the old fund was originally created. Therefore, when a transfer was made, the policyholder in reality paid in full for a portion of his insurance. Mathematically it is possible to collect any amount as a down payment on a policy and to collect the balance over a period of years. This was what was done in this particular case. However, in calculating reserves on such contracts the company would be confronted with a multiplicity of calculations and the work involved in making them would be too great for practical operation. However, by making this calculation in two parts the work involved is very much simplified and the results obtained are the same."

He also demonstrated mathematically that, with respect to a legal reserve policy issued in exchange for a benefit certificate, it is the premium reduction credit plus the present value of the future reduced net premiums which equals the present value of future benefits.

■ We think that the testimony of the three actuaries established to a mathematical certainty that the reserves maintained by the petitioner, including the "Premium Reduction Credit Reserve," did not, in the years in question, exceed the reserves which the petitioner was required to maintain under the laws of Nebraska. The respondent introduced no testimony to prove the contrary.

The Tax Court, in its opinion, refers to the definition of "reserve" by the Supreme Court in Maryland Casualty Co. v. United States, 251 U.S. 342, 350, 352, 40 S.Ct. 155, 158, 64 L.Ed 297. The Supreme Court in that case said:

"The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set aside— 'reserved'—as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment.

\*    \*    \*    \*    \*

"Reserves, as we have seen, are funds set apart as a liability in the accounts of a company to provide for the payment or re-insurance of specific contingent liabilities. They are held, not only as security for the payment of claims, but also as funds from which payments are to be made."

Certainly no life insurance company would reinsure the legal reserve policies which were written by the petitioner at rates reduced by the transfer of premium reduction credits, unless the reinsuring company received those credits as part of the reserves maintained with respect to those policies. In other words, it is apparent that the reserves without those credits would be inadequate either to meet or to reinsure the contingent policy liabilities of the petitioner.

The facts relative to the second question presented for review are, in substance, as follows: Mr. Spangler, the actuary of the petitioner, to show that certain adjustments should be made in the returns for the taxable years in question, testified, in substance, that in the 1937 return $1,632.45, representing the net proceeds of the sale of cattle, was erroneously included in gross income as rents, and that in the 1938 return $6,417.04, representing the net proceeds of the sale of cattle, was also included as rents in gross income. It is conceded that the net proceeds of the sale of cattle were not gross income under § 202(a) of the Revenue Acts of 1936 and 1938. While Mr. Spangler did not produce the books and records of the company with respect to the sales of cattle referred to, it was obvious that his figures were based upon such records. He testified that exhibits, attached to the petition filed with the Tax Court, showing the adjustments contended for, were made under his supervision and that the figures in the exhibits were correct as shown by the petitioner's books. The respondent was represented by counsel, who made no objection to the testimony of Mr. Spangler on the ground that it was incompetent or on any other ground, and who asked no questions, on cross-examination, relative to the proceeds of the sales of cattle. No suggestion was made by respondent's counsel, or by the Tax Court, that the petitioner should produce its books and records to substantiate its claims with respect to the erroneous inclusion of proceeds of the cattle sales. In its decision, the Tax Court said: "It is impossible to make findings of fact based upon this testimony which would form the basis for a conclusion that the amounts in issue had been erroneously included in petitioner's gross income for the two years as alleged. The question need not be labored. Suffice it to point out that petitioner has not shown how, when, or under what circumstances the cattle were acquired or sold, how much they cost, what the sales prices were, or what expenses were incurred in making the sales. Without this information the 'net proceeds' derived can not be computed. This issue must be decided against petitioner for failure to sustain its burden of proof."

■ The Tax Court is, of course, the judge of the credibility of witnesses who appear before it, and of the weight of their evidence, but we think that, under the circumstances of this case, the petitioner might fairly have assumed that the respondent was not questioning or controverting the petitioner's assertions or its evidence as to the erroneous inclusion in gross income of the net proceeds of sales of cattle. There was certainly no evidence that such proceeds had not been included in gross income.

■ We shall not say that the Tax Court was required to base a finding upon the evidence produced, but we do say that, if the court was unwilling to accept the petitioner's evidence as proof, the petitioner should have been so advised at the hearing and given an opportunity to verify, by other evidence, the testimony of its actuary. It is certain that if the petitioner made the errors in its returns which it asserts that it made, it will be required to pay more taxes than it owes. Our conclusion is that the Tax Court should give the petitioner a further opportunity to prove that net proceeds of the sale of cattle were erroneously included in gross income in the years in question. See and compare Forrester Box Co. v. Commissioner, 8 Cir., 123 F.2d 225, 229, and cases cited.

The decision of the Tax Court that the "Premium Reduction Credit Reserve" of the petitioner was not a reserve required by law, is reversed; and the case is remanded with directions (1) to permit the petitioner to introduce evidence to show whether net proceeds of the sale of cattle were erroneously included in gross income in its returns for the years 1937 and 1938, and (2) to redetermine the deficiencies in income taxes of the petitioner for those years, in conformity with this opinion.