**COMMISSIONER OF INTERNAL REVE-
NUE v. NUBAR.**

**No. 6145.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 13, 1950.

Decided Nov. 8, 1950.

Rehearing Denied Dec. 20, 1950.

Irving I. Axelrad, Sp. Asst. to Atty. Gen.
(Theron Lamar Caudle, Asst. Atty. Gen.,
Ellis N. Slack and Helen Goodner, Sp.

Assts. to Atty. Gen., on the brief), for petitioner.

Henry Mannix and Charles K. Rice, New York City, for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a decision of the Tax Court involving deficiencies of $318,220.26 in income taxes assessed for the years 1941, 1943 and 1944 against a citizen of Egypt who had been in this country from 1939 to 1945 and who had made profits of exceeding $600,000 during the years in question by trading on the exchanges of the country in stocks and commodities. Taxpayer contended that he was a non-resident alien not engaged in a trade or business within the United States and that, by reason of the provisions of 26 U.S.C.A. § 211(a) and (b), he was not taxable on the capital gains which he had realized. The Tax Court so held, 13 T.C. 566, and the Commissioner has appealed.

The evidentiary facts are fully set forth in the findings of the Tax Court and need not be repeated here. They may be briefly summarized as follows: Taxpayer is a wealthy Egyptian who prior to the late world war lived with his family in France and Switzerland, maintaining an apartment in Paris and a summer home in Geneva. He came to the United States on August 1, 1939, and was here continuously thereafter until August 15, 1945. His purpose in coming was to visit the New York World's Fair and to travel in this country and later in Central and South America. He was admitted on a three months visitor's visa; but after the war in Europe had begun, he applied for and obtained a number of extensions which expired December 31, 1940. In January 1941 he was arrested on a charge of being in the country in violation of the immigration laws, but was released on bond and applied for and obtained a number of delays in the proceedings. It was finally ordered by the Board of Immigration Appeals in 1944 that an order of deportation should not be entered at that time but that taxpayer would be required to leave the United States at his own expense within ninety days after the termination of hostilities in Europe.

During 1940 and 1941 petitioner made application for visas to visit Mexico, but these were denied. He inquired of the French consulate in 1940 about returning to France, but was told that he could not return to that country. In 1941 he obtained a Swiss visa but had not been able to obtain visas from French, Spanish or Portugese consulates. He abandoned the plan to return to Switzerland at that time because of "the delays in getting other visas, plus the dangers of wartime travel and poor health". Thereafter, for four years he made no further effort to leave the country, but settled down to wait out the war, and this he did very profitably. In making applications for extensions of visas he asked, as early as 1939, that he be allowed to stay "for a year or until the end of the war"; and he made no real effort to leave the country for Europe until after the war was over.

Prior to coming to this country, taxpayer had engaged in trading on stock and commodity exchanges in a large way. In 1930 he opened accounts in New York with brokerage firms having Paris connections. In 1938 he transferred $165,000 to his account with one of these firms; and this was used to purchase on margin securities which were sold shortly thereafter. When he arrived here in 1939 he had a credit balance of $202,709 with this firm, $32,000 with another firm, and securities valued at around $100,000 deposited with a New York bank. When he left the country in 1945 he had $2,496,952 in securities and owed $721,423.53 for borrowed money.

During 1939 and 1940 taxpayer's accounts with his brokers remained relatively inactive; but this was not true of the succeeding years. In 1941 there were 77 purchases of stocks and bonds and 60 sales; in 1942, 243 purchases and 60 sales; in 1943, 185 purchases and 111 sales; and in 1944, 125 purchases and 97 sales. The net capital gain on these transactions was $62,795, $62,281, $229,244 and $202,823 respectively. They involved the purchase of 217,423 shares of stock and the sale of 113,001

shares and purchase and sale of securities of a total value of $6,525,858.92. During the same years, taxpayer was dealing in commodities futures, buying and selling "practically all" commodities, including cotton, wheat, sugar, pepper, silk and lard, and realized gains thereon of $62,795 in 1941, $2,775 in 1943 and $1,660 in 1944, and sustained a loss of $4,162 in 1942. All of this trading was effected through brokers on exchanges but was done on margin and required the attention of taxpayer while he was living in this country awaiting the end of the war.

Upon these facts, we think that the conclusion of the Tax Court that taxpayer was an alien non-resident and was not engaged in business in the United States was clearly erroneous, whether regarded as a conclusion of fact or as a conclusion of law. We find nothing in the law or in the facts to justify the exemption of this alien, who had lived in our country during the war years because of the difficulties and dangers of departure, and who had availed himself of his presence here to make a fortune by trading on our exchanges, from taxes required of others by the country whose protection he had enjoyed and whose economic organization he had utilized for his profit. On the contrary, we think it clear that he was not a non-resident alien within the meaning of the statutory exemption[1] and that he was engaged in business within the United States so as to take him without the exemption even if he were properly considered a non-resident alien.

Whether taxpayer was a non-resident within the meaning of the statute is to be determined not in vacuo, but with reference to the purpose for which the statute was passed, which was to exempt from taxation, except as to taxes which could be collected at the source, aliens over whom no effective jurisdiction in enforcement of the tax laws could be exercised. It was never intended that persons who were present within the country for long periods of time and had taken advantage of its facilities for the purpose of carrying on business, should be exempted from taxation on income derived from sources within the country merely because they were aliens. The Tax Court in applying the statute has confused "residence" with "domicile" and has given too little weight to the long period that taxpayer was living and doing business in the country and to the fact that he had the intention of staying here until the war in Europe had ended and he could safe-

1. The provisions of the statute upon which taxpayer relies are section 211 (a) and (b) of the Internal Revenue Code, 26 U.S.C.A. § 211(a, b). The pertinent provisions of the applicable section are as follows:

"§ 211. Tax on Non-resident Alien Individuals.

"(a) No United States business or office (1) General rule (A) [As amended by Sec. 106 (a) and Sec. 160 (e) of the Revenue Act of 1942, c. 619, 56 Stat. 798] Imposition of tax. There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every non-resident alien individual not engaged in trade or business within the United States, from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 30 per centum of such amount, except that * * *

"(b) United States business or office. [As amended by Sec. 160 (d) and Sec. 167 of the Revenue Act of 1942, supra.]— A nonresident alien individual engaged in trade or business in the United States shall be taxable without regard to the provisions of subsection (a). As used in this section, * * * the phrase 'engaged in trade or business within the United States' * * * does not include the effecting, through a resident broker, commission agent, or custodian, of transactions in the United States in commodities (if of a kind customarily dealt in on an organized commodity exchange, if the transaction is of the kind customarily consummated at such place, and if the alien, partnership, or corporation has no office or place of business in the United States at any time during the taxable year through which or by the direction of which such transactions in commodities are effected), or in stocks or securities. * * * *".

ly depart. What was said by Judge Dobie, speaking for this court in C.I.R. v. Swent, 4 Cir. 155 F.2d 513, 515, quoted with approval in the recent case of Myers v. C.I.R., 4 Cir. 180 F.2d 969, is appropriate here, viz.:

"The word 'resident' (and its antonym 'nonresident') are very slippery words, which have many and varied meanings. Sometimes, in statutes, residence means domicile; sometimes, as in the instant case, it clearly does not. When these words, 'domicile' and 'residence', are technically used by persons skilled in legal semantics, their meanings are quite different. This distinction is clearly set out in the matter of Newcomb's Estate, 192 N.Y. 238, 250, 84 N.E. 950, [951], 954:

" 'As "domicile" and "residence" are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning, but they are not identical terms, for a person may have two places of "residence," as in the city and country, but only one "domicile." *"Residence" means living in a particular locality,* but "domicile" means living in that locality with intent to make it a fixed and permanent home. *"Residence" simply requires bodily presence as an inhabitant in a given place,* while "domicile" requires bodily presence in that place and also an intention to make it one's domicile.' (Italics supplied).

"We think the error into which the Tax Court fell was partially caused by a confusion of these terms in lending to the word 'residence' some attributes which really belong only to the word 'domicile', and by laying too great stress, as to 'residence', on the animus revertendi."

What was intended by the statute was well set forth, we think, by Treasury Regulation 111 (Regulation 29.211-2) which provides: "An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; *but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident,* though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances." (Italics supplied).

It is well settled that a regulation of long standing, such as this, promulgated by the department charged with the enforcement of the statute, is entitled to great weight in its interpretation and will be enforced unless unreasonable or inconsistent with the statute; C.I.R. v. Wheeler, 324 U.S. 542, 65 S.Ct. 799, 89 L.Ed. 1166; Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101; Fawcus Machine Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457; and this regulation has been recognized as valid and has been enforced by the courts in determining what constitutes non-residence. Myers v. C.I.R. supra; Swenson v. Thomas, 5 Cir. 164 F. 783. We think it effectively disposes of taxpayer's contention that he was a non-resident alien.

Taxpayer was not a mere transient or sojourner. While he may have come originally to the United States to visit the World's Fair and travel about the country, this original purpose was superseded after the war had commenced and travel had become difficult and dangerous by the purpose to remain in the country until after the war. The fact that taxpayer's decision so to remain was the result of difficulties in obtaining visas, dangers of foreign travel and the condition of his health, does not nullify the effect of the decision. As was well said by the Tax Court, speaking through Judge Hill, in the Matter of Seeley, 14 T.C.

175: "It may be true, as petitioner contends, that it was impossible for him to return to Sweden, due to circumstances caused by the war, but we think that that, argument could also be used in support of respondent's position. If, as petitioner says, it was impossible for him to return to Sweden, did he not then, from the time it was determined that conditions would not permit his return, fully intend to be a resident of the United States until those conditions were removed? We think, in view of the facts above outlined here, that that question must be answered in the affirmative."

The fact that taxpayer was permitted by the immigration authorities to remain in the country does not nullify the effect of his purpose to remain but rather accentuates it, since the order permitting him to remain until the end of the war was entered in a proceeding in which an effort was being made against his opposition to get him out of the country, and the order gave validity to his intention to remain here until the war was over. He cannot bring himself under the rule of the last sentence of the regulation above quoted since his stay was not one limited to a definite period by the immigration laws but one permitted for an indefinite period as a matter of grace notwithstanding his violation of those laws. And see Schumacher v. C.I.R., 32 B.T.A. 1242. The purpose to remain until after the end of the war was clearly a purpose of such a nature that an extended stay might be necessary for its accomplishment and to that end he was making his home temporarily in the United States and thus became a resident as provided by the portion of the regulation which we have italicized.

And we think it equally clear that taxpayer was engaged in business within the United States within the meaning of the statute and was not taken out of that category because the business resulted in purchases and sales effected through resident brokers. The provision last referred to was inserted in the statute to exempt those transactions in securities or commodities whose sole connection with business done in the United States was the activity of the broker. That is not the case here. The brokers merely carried out for taxpayer the purchases and sales which he determined upon in the course of the trading in which he himself was engaged. This involved, not merely purchases and sales of securities and commodities, but the forming of judgments and the making of decisions with regard thereto; and these were made by taxpayer in the exercise of his business judgment, just as in the case of any other trader in the United States, before the orders to buy or sell were communicated to the brokers. That taxpayer could maintain better contact with economic forces, and thus be in position to trade more satisfactorily, in New York than in war beleaguered Europe, goes without saying; and this advantage of taxpayer's presence in this country, which was an important element in his trading here, may not be ignored and the case treated as though it involved nothing more than sales and purchases by brokers for a principal across the seas.

There can be no question but that the extensive trading in stocks and commodities constituted engaging in trade or business within the meaning of the statute. See Snyder v. C.I.R., 295 U.S. 134, 139, 55 S.Ct. 737, 79 L.Ed. 1351; Field v. C.I.R., 2 Cir., 139 F.2d 465; Adda v. C.I.R., 10 T.C. 273, affirmed, 4 Cir., 171 F.2d 457, certiorari denied 336 U.S. 952, 69 S.Ct. 883, 93 L.Ed. 1107; Higgins v. C.I.R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783, is not to the contrary. The holding there was merely that salaries and other expenses incident to looking after one's investments were not deductible as business expense where the Commissioner and the Board of Tax Appeals appraised the facts and held them insufficient to establish the doing of business. Nothing was said to indicate that such extensive trading as was disclosed here would not constitute doing business, and the Court pointed out that whether the activities of a taxpayer constitute "carrying on a business" requires an examination of the facts in each case.

Directly in point and controlling on the case before us is the decision in Adda v. C.I.R. supra. In that case the brother of the taxpayer there was present in the United

States and carried on business for the taxpayer in that case just as the taxpayer here carried on business for himself. In holding that the gains and profits there were subject to the tax, the Tax Court said: "Trading in commodities for one's own account for profit may be a 'trade or business' if sufficiently extensive. Fuld v. C.I.R., 2 Cir., 139 F.2d 465; Norbert H. Wiesler, 6 T.C. 1148; affirmed without discussion of this point, 6 Cir., 161 F.2d 997. The respondent determined that the petitioner was engaged in trade or business in the United States. While the number of transactions or the total amount of money involved in them has not been stated, it is apparent that many transactions were effected through different brokers, several accounts were maintained, and gains and losses in substantial amounts were realized. This evidence shows that the trading was extensive enough to amount to a trade or business, and the petitioner does not contend, nor has he shown, that the transactions were so infrequent or inconsequential as not to amount to a trade or business. Had the petitioner come to the United States and effected these transactions while here for a sufficient period he would be taxed upon the profits of these transactions, for he would lose the status of non-resident alien and section 211 would not be applicable. He seeks to accomplish in this case, through his brother as his agent, what he could not accomplish directly by himself, that is to effect transactions by decisions made in the United States by one who is not a resident broker, commission agent, or custodian, and not be taxed upon the gains."

We thought that the Tax Court was so clearly correct that we affirmed with a per curiam opinion, adopting the opinion of the Tax Court and giving the crux of our own thinking in the following words: "We agree with the Tax Court that, for reasons adequately set forth in its opinion, this income was subject to taxation, and that the exemption of a nonresident alien's commodity transactions in the United States, provided by section 211 (b) of the Internal Revenue Code, 26 U.S.C.A. § 211 (b), does not apply to a case where the alien has an agent in the United States using his own

discretion in effecting the transactions for the alien's account. As said by the Tax Court, 'Through such transactions the alien is engaging in trade or business within the United States, and the profits on these transactions are capital gains taxable to him.'"

We think that the decision in the Adda case was sound; and, if it stands, the decision below must be reversed. It would be absurd to hold that an alien is taxable on gains derived from business carried on by an agent in this country but is not taxable if he himself carries on the business. And we are not shaken by anything decided by the Tax Court in the case of Constantinescu, 11 T.C. 36. It does not appear that the transactions in securities there constituted a doing of business; and, in so far as the holding there as to non-residence conflicts with the holding here, we regard it as no sounder than the decision here under review.

For the reasons stated, the judgment of the Tax Court will be reversed and the case will be remanded for further proceedings in accordance with this opinion.

Reversed.

### On Petition for Rehearing.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

### PER CURIAM.

The petition for rehearing in this case presents nothing that has not already been fully considered by the court. There were no irregularities in procedure on the hearing. On the contrary, what respondent complains of as irregularities were efforts on the part of the court to assure him the fullest possible hearing. The court advised counsel from the bench that, under the recent statute, 26 U.S.C.A. § 1141, decisions of the Tax Court were reviewed like decisions of the District Courts and that its findings of fact were not absolutely binding on the reviewing court as was formerly the case. After the case had been submitted, counsel for respondent asked leave to file a brief discussing the facts at greater length in view of this statement

from the bench. Leave was granted and the brief was filed. Leave was, of course, granted to the other side to file a reply to the brief which respondent was permitted to file. The parties were thus given full opportunity to discuss the facts in their briefs. In addition to this, the facts were fully discussed in the oral argument. The petition for rehearing presents no fact or argument that was not fully developed before the court.

Petition denied.