### MARSMAN v. COMMISSIONER OF INTERNAL REVENUE.

No. 6535.

United States Court of Appeals Fourth Circuit.

Argued April 13, 1953.

Decided June 3, 1953.

Rehearing Denied July 7, 1953.

Herbert W. Clark, San Francisco, Cal. (Nelson T. Hartson, Seymour S. Mintz, William T. Plumb, Jr., Washington, D. C., Leon F. De Fremery, Clarence E. Musto, Richard J. Archer, Morrison, Hohfeld, Foerster, Shuman & Clark, San Francisco, Cal., and Hogan & Hartson, Washington, D. C., on the brief), for petitioner.

Louise Foster, Special Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Helen Goodner, Special Assts. to the Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This petition to review the decision of the Tax Court presents the questions whether Mary A. Marsman, a citizen of

the Commonwealth of the Philippines, was a resident of the United States during the period from September 22, 1940 to December 31, 1941, and if so, whether she is liable for United States income tax on certain undistributed net income held on December 31, 1940 by La Trafagona, a Philippine corporation, wholly owned by her. If these questions are resolved against the taxpayer, it is also necessary to determine (1) whether the tax should be based on one-half of the entire amount of the undistributed income [1] of La Trafagona on December 31, 1940, or only so much thereof as was acquired after September 22, 1940, when she became a resident of the United States; and (2) whether the taxpayer, being on a cash basis, is entitled to a credit against her United States income tax for 1941 in the amount of the income taxes paid by her to the Philippine Islands in 1941 for the years 1938 and 1940.

The Tax Court found that Mrs. Marsman was a resident of the United States between September 22, 1940 and December 31, 1941, the tax periods involved herein, and that she was taxable on the undistributed income of La Trafagona for the entire year 1940 rather than for the period from September 22 to December 31, 1940, and that no part of the income taxes paid to the Philippine government in 1941 was available to her as a credit against the United States income taxes due by her for that year.

The evidence on the controlling issues of residence may be summarized as follows: The taxpayer, a native of Scotland, and her present husband, J. H. Marsman, a native of Holland, became residents of the Philippines prior to 1920 and were married there in that year. They were naturalized in the Philippines in 1934 and became citizens of the Commonwealth in 1935 and remained citizens during the taxable period.

During these years each of them controlled large corporate business enterprises through the medium of a wholly owned Philippine holding company, that is, La Trafagona, owned by the taxpayer, and El Emprendedor, owned by her husband. They maintained two large and well furnished houses in the Philippines, one in Manila and another at Baguio, which were adequately staffed and always open for occupation. In 1939 and 1940 they made extensive improvements in these residences and acquired new furnishings for them.

In 1939 they planned to place their daughter Anne in school in England or on the continent of Europe, and on April 28 of that year, the three came to San Francisco partly for this purpose and partly to combine a business trip to the United States with a vacation in Europe. After their arrival Mr. Marsman, whose wide connections kept him well informed of the threat of war, concluded that it was not advisable to take his family to Europe and so he left them in California and flew to Europe on a business trip. He returned to San Francisco in September and shortly thereafter returned to Manila and did not return to the United States until December, 1939.

The husband and wife opened a joint account with a stockbroker in San Francisco in 1939 and Mrs. Marsman also opened such an account in her own name.

When the family first arrived in San Francisco in April, 1939 they took up residence in a hotel, accompanied by several servants. In June, 1939 Marsman bought a house for $30,000 and furnished it for use as a residence by the daughter while in attendance at school, and persons were engaged to care for her and the residence during her parents' absence. In 1943 the house was sold and another was purchased in Los Altos, California.

The daughter was enrolled in a private school in San Francisco in September, 1939, completed her first year, and left for Manila in July, 1940. Her parents had preceded her in the previous April. They bought a yacht in California for $75,000 in 1940 and engaged a crew to sail the vessel to the Philippines in April.

1. It is conceded that the taxpayer's income under Philippine law is community property and that she is chargeable for only one-half of the undistributed property of La Trafagona.

The tax period under consideration began on September 22, 1940, when Mrs. Marsman and the daughter returned to San Francisco by air, and the child was again entered in school. Marsman remained in Manila except for short business trips and a visit to the United States from June to September, 1941, when he returned to Manila. In December, 1941 he flew to Hong Kong and was captured by the Japanese. He escaped and came to the United States in 1942. He was not a resident of the United States at any time during the tax period which ended December, 1941.

Mrs. Marsman remained in the United States continuously from September 22, 1940 until 1945. She and her daughter were admitted on the occasion of their first visit in April, 1939 for "a temporary period of six months." In October, 1939 an extension of the temporary stay was granted for six months. On September 22, 1940, the mother and daughter were admitted for "a temporary period of ten months." On July 1, 1941 an extension for one year was requested for the reason that conditions abroad were still in an unsettled state; and in 1942, 1943 and 1944 additional extensions were requested and granted because of the war. In 1945 a one year extension was denied. On February 7, 1948 the taxpayer was allowed to enter the United States through Canada as a permanent British immigrant.

Mrs. Marsman denied that she formed the intent to remain in the United States during the taxable period, but there is nevertheless abundant evidence that her extended stay in this country was caused by war conditions and the desire to avoid the danger that would have attended a return to the Philippines. The Marsmans were acquainted with persons of importance in many parts of the world and through their contacts were led to believe that there was grave danger of war in the Orient in 1940. Correspondence between the husband in Manila and the wife in San Francisco in the fall of 1940 and thereafter indicates his fear of war, his acquaintance with the preparations of the United States in the Philippines to meet the emergency, and his satisfaction that his wife was in a safe place. Her letters to him frequently expressed her desire to return to her home, even as late as October, 1941, as well as her sense of obligation to the Marsman employees in the Philippines, but she nevertheless yielded to his wishes and his advice and was herself convinced of the danger, and in October, 1940, advised relatives in Canada to stay away from Manila.

In view of these facts we are of the opinion that the Tax Court was justified in finding that on September 22, 1940 Mrs. Marsman "had a definite intent to remain in the United States until such time as the danger of war in the Orient subsided"; and we do not think that the issuance of certificates for a stay in this country for temporary periods, or the presence of her daughter at school in San Francisco, or the strong desire of the taxpayer to return to her established home in the Philippines as soon as it should become safe for her to do so, are inconsistent with the court's conclusion. The case is governed by Treasury Regulations 111 § 29.211–2 where it is laid down that one who comes to the United States for a purpose of such a nature that an extended stay may be necessary for its accomplishment, and to that end makes his home temporarily in the United States, becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. The weight to be given to this Regulation in considering a question of residence in the application of the income tax law, was discussed by this court under somewhat similar factual conditions in Commissioner of Internal Revenue v. Nubar, 4 Cir., 185 F.2d 584, and Commissioner of Internal Revenue v. Patino, 4 Cir., 186 F.2d 962. We conclude that the taxpayer was taxable as a resident alien during the taxable years.[2]

2. Section 29.211–2 of the Regulations also provides that an alien whose stay is limited to a definite period by the immigration laws is not a resident in the absence of exceptional circumstances; and Section 29.211–4 states that an alien is

We come then to the questions relating to the inclusion of the undistributed net income of La Trafagona in the taxable income of Mrs. Marsman for the year 1940, and her claim to a credit against her United States income tax for 1941 of the amount of the income taxes paid by her to the Philippine government in 1941. The undistributed net income of La Trafagona for the entire year 1940 was $130,357.04, when computed under the provisions relating to "undistributed Supplement P net income" contained in Section 335 of the Internal Revenue Code, 26 U.S.C.A. § 335. The amount is not in dispute and the controversy is as to what portion thereof should be included in the taxable income, the taxpayer contending that the income acquired by the corporation prior to September 22, 1940 is not taxable in the United States, while the government contends that the income of the corporation for the entire taxable year was taxable to Mrs. Marsman. The statute relied on is Section 337 of the Internal Revenue Code, 26 U.S.C.A. § 337, which provides that the undistributed Supplement P net income of a foreign personal holding company shall be included in the gross income of citizens or residents of the United States who are shareholders thereof in the manner and to the extent set forth in the Supplement. Section 331 provides that a foreign corporation is such a holding company, if at least 50 per cent of its gross income (as defined in Section 334(a) is of the character described in Section 332, and if at any time during the taxable year more than 50 per cent in value of its outstanding stock is owned by not more than five individuals or residents of the United States who are called "United States group".

It is not disputed that La Trafagona meets these requirements both as to the nature of its income and the ownership of its stock. The question is as to the interpretation of Section 337 which specifies the amount of the undistributed Supplement P net income which shall be included in the gross income, as follows:

"(a) *General rule.* The undistributed Supplement P net income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States * * * who are shareholders in such foreign personal holding company (hereinafter called 'United States shareholders') in the manner and to the extent set forth in this Supplement.

"(b) *Amount included in gross income.* Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the last day on which a United States group (as defined in section 331(a)(2) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend if on such last day there had been distributed by the company, and received by the shareholders, an amount which bears the same ratio to the undistributed Supplement P net income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year."

It will be seen that this section requires every "United States shareholder" of a foreign personal holding corporation to include in his gross income certain undistributed net income of the corporation if he was a stockholder on the last day in the tax year when the United States group was in existence. In this case the group consisted of Mrs. Marsman alone and she remained the sole shareholder until the last day of the year, so that she is within the definition of shareholder contained in the statute. As such she is required to include in her gross taxable income the amount she would have received as a dividend up-

presumed to be a non-resident but that the presumption may be overcome by proof that his stay in this country has been of such an extended nature as to constitute him a resident. It is evident, however, that these provisions do not conflict with the conclusion that has been reached.

on the last day of 1940 if on that day there had been distributed to her as the sole stockholder "an amount which bears the same ratio to the undistributed Supplement P net income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year." Since the last day in this case is the last day of the year 1940, Mrs. Marsman would be required to include in her gross income the Supplement P net income of La Trafagona for the entire year, if the language of the section is to be given a strictly literal interpretation.

We do not think, however, that the statute should be applied literally and without reference to the purpose for which it was admittedly enacted. The provisions of the statute now set out in Sections 331 to 340 of the Internal Revenue Code, 26 U. S.C.A. §§ 331–340, as Supplement P—Foreign Personal Holding Companies, were first enacted in Title II of the Revenue Code of 1937. They were passed by Congress to prevent the avoidance of income tax by taxpayers in the United States which was accomplished by placing income of the taxpayer in the hands of a foreign holding company that was itself not subject to the jurisdiction of the United States. The Ways and Means Committee of the House of Representatives made this plain in its report to the House (H.R.Rep. No. 1546, 75th Cong., 1st Sess. 1937), when it said: "* * * The evidence presented to the Joint Committee has shown that foreign personal holding companies have afforded one of the most flagrant loopholes for tax avoidance. The use of such corporations has greatly increased within the last few years. Unless immediate preventative measures are taken increased loss of revenue will be suffered in the future."

The statute was obviously designed to reach the income of persons who were subject to the tax laws of the United States but were eluding taxation through the foreign holding company device. Accordingly Section 331(a)(2) provided that the stock ownership requirement of a foreign personal holding company should be the ownership of 50 per cent in value of its outstanding stock by not more than five individual citizens or residents of the United States, who are called "United States group" in Section 331 and "United States shareholders" in Section 337; and Section 337 provided that the undistributed Supplement P income of such a corporation must be included in the gross income of such shareholders. Thereby the distinction between the corporate entity and its controlling United States shareholders was wiped out for the purposes of income taxation and the tax avoidance device of placing undistributed taxable income in a corporation outside the United States was frustrated.

But Congress did not intend to reach the income of persons, such as alien non-residents, which was not subject to the laws of the United States when it was received by them or by a holding company subject to their control. If that part of the income of Mrs. Marsman, now sought to be taxed, which was earned prior to September 22, 1940, had been received by her instead of by her holding company prior to that date, no one would contend that it was subject to taxation by the United States when she became a resident of this country; and it is not reasonable to suppose that Congress intended that the statute should produce such an unlooked for result. The government's answer to this view is that the taxpayer and the holding corporation are separate and distinct entities in the eye of the law, and hence the income of La Trafagona prior to September 22, 1940 was not the taxpayer's income, when received, but became such only after she acquired a residence in this country and became subject to the provisions of the statute which converted undistributed income of a holding company into the income of the shareholders as of the last day of the year. We cannot agree with this analysis of the problem, for it not only extends the statute far beyond its announced purpose, but it is inconsistent in itself in that it treats the taxpayer and the corporation as distinct legal persons during the first part of the year but as one and the same person after the taxpayer acquired her residence in the United States. If the government's contention is sound, an alien,

who controls a foreign holding company with undistributed income and becomes a resident of the United States on the last day of the year, and hence is a taxpayer of the United States for only a single day, would be subject to income tax upon the income for the entire year. We cannot attribute to the Congress of the United States the intent to accomplish such an extraordinary result.

A more reasonable approach has been taken by the Tax Court in the analogous situation which occurs when there is a change in the status of a taxpayer during the tax year, as where a taxpayer, who is exempt from income tax at the beginning of the year, loses the exemption in the course of the twelve months. Thus in Economy Savings & Loan Co. v. Com'r, 6 Cir., 158 F.2d 472, a building and loan association, which was exempt from taxation because its business was substantially confined to making loans to members, lost its exemption during the year by changing substantially all of its business to lending money to depositors. Although the statute made no specific provision for such a contingency, the court held that the income for the portion of the year prior to the change of business operations was exempt but that the income for the remainder of the year was subject to taxation. See also Royal Highlanders v. C. I. R., 1 T.C. 184, reversed on other grounds, 8 Cir., 138 F.2d 240; Reserve Loan Life Ins. Co. of Tex. v. C. I. R., 4 T.C. 732.

No reason is suggested, other than the insistence upon a literal interpretation of the statute regardless of results, why a similar procedure should not be followed in the pending case. Returns for a fractional part of the tax year are recognized by Section 48(a) of the Internal Revenue Code, 26 U.S.C.A. § 48(a). Such a return was required of the taxpayer for that part of the year which began when she took up her residence in this country; and if the taxpayer is permitted to limit her report of the undistributed income of La Trafagona to the amount received by that corporation during the last 101 days of 1940, she will pay the tax on all the income received during the period when she was subject to

the tax laws of the United States and the purpose of the statute will be effectuated.

This view is in accord with the rule of interpretation enunciated in United States v. Amer. Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345, where the court declined to interpret literally the word "employee" as found in the Motor Carriers Act, because it would place upon the Interstate Commerce Commission, contrary to the settled practice of Congress, the duty of regulating the qualifications of a large number of employees who had nothing to do with safety of operation. The court said, 310 U.S. at pages 543–544, 60 S.Ct. at page 1063:

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' "

The last question for decision relates to the right of the taxpayer to a credit against her United States income tax for the year 1941 of the amount of her Philippine income taxes for the years 1938 and 1940, paid by her in 1941. In the last mentioned year, the taxpayer, her husband and daughter, filed joint Philippine income tax returns for the years 1938–41, and paid to the Philippine government 265,812.87 pesos for a deficiency in income tax for the year

1938, and 198,699.12 pesos for income tax for the year 1940.

The taxpayer bases her claim to the credit upon the literal unambiguous wording of Section 131 of the Internal Revenue Code, as amended by the Revenue Act of 1942, 26 U.S.C.A. § 131, as follows:

"Sec. 131(a) *Allowance of Credit.*— If the taxpayer chooses to have the benefits of this section, the tax imposed by this chapter, except the tax imposed under section 102 or section 450, shall be credited with:

\*   \*   \*   \*   \*   \*

"(2) *Resident of United States.*— In the case of a resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and  \*  \*  \*."

"Section 131(b) *Limit on Credit.*— The amount of the credit taken under this section shall be subject to each of the following limitations:

"(1) The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources within such country bears to his entire net income, in the case of a taxpayer other than a corporation,  \*  \*  \*."

The taxpayer contends that the full amount of the Philippine income taxes paid by her in 1941 is available to her as a credit against her United States income tax for that year because the payments fell clearly within the express terms of Section 131(a)(2) subject only to the limitation contained in Section 131(b) which in this case means that the amount of the credit shall not exceed the same proportion of the United States tax as her taxable income derived from the Philippines bore to her entire income.

■ The Tax Court denied the credit as to 1938 entirely and allowed the credit as to 1940 only as to such portion of the Philippine income taxes as were allocable to the period between September 22 and December 31, 1940, during which the tax-

payer was a resident of the United States. In so doing the Tax Court departed from its insistence upon the literal meaning of the applicable statute which it displayed in interpreting Section 337 of the Internal Revenue Code as shown above, and held that Section 131 should be so construed as to effect the Congressional purpose to allow a credit of taxes paid to other countries so as to lift the burden of double taxation from the shoulders of the taxpayer.

■ We are in accord with this interpretation. The Supreme Court has held that the primary purpose of the tax credit, which was first authorized by Section 222 of the Revenue Act of 1918 and is now found in Section 131, was to mitigate the evils of double taxation. See Burnet v. Chicago Portrait Co., 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587; American Chicle Co. v. United States, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591; Hubbard v. United States, Ct.Cl., 17 F.Supp. 93, certiorari denied 300 U.S. 666, 57 S.Ct. 508, 81 L.Ed. 873. This purpose will not be served and double taxation will not be avoided by allowing the credit now sought by the taxpayer because the 1938 and 1940 Philippine income taxes paid by the taxpayer in 1941 were imposed upon income which was never subjected and could not be subjected to the United States income taxes for the reason that the taxpayer was a nonresident of the United States until September 22, 1940 and the Philippine income during these two years was derived from sources outside the United States. To allow the credit under such circumstances would be to give preferred status to a citizen of the Philippines as compared with a citizen of the United States, and it is not reasonable to suppose that such a result was within the contemplation of Congress.

Other cognate sections of the taxing statutes support this construction of Section 131. It is provided in Section 252 of the Internal Revenue Code, 26 U.S.C.A. § 252, that an individual, such as the taxpayer, who was a citizen of a possession of the United States but not otherwise a citizen of the United States, shall be taxed only on income derived from the United States, and that the tax must be computed,

as in the case of other persons who are taxable only on income derived from the United States. These other persons are non-resident aliens who by the terms of Section 216 of the Code are expressly denied tax credits based on taxes paid to foreign countries and possessions of the United States. Consequently, if the taxpayer had had income from sources within the United States in 1938 or in 1940 prior to September 22, she would have been allowed no credit for the Philippine taxes paid for these years. In view of these provisions of the tax statutes relating to non-residents it would be anomalous to hold that when the taxpayer became a resident of the United States in 1940 and paid in 1941 overdue Philippine income taxes for 1938, she became entitled to a tax credit under Section 131 which could not have been allowed if the tax had been paid in the year when it was due and payable.

The taxpayer relies on the decision of this court in Helvering v. Campbell, 4 Cir., 139 F.2d 865, where we held that a United States citizen residing in the Philippine Islands was entitled to a credit for the entire Philippine income tax and not merely to a credit for the taxes paid on a portion of the income. But this decision related not to the right to a credit for Philippine taxes paid during the year but to the amount of the credit to be allowed, and we do not regard it as controlling in the present case.

The decision of the Tax Court will be affirmed as to the question of residence and the question of the proper tax credit to be allowed, and will be reversed as to the amount of the undistributed income of La Trafagona to be included in the income of the taxpayer subject to the United States income tax, and the case will be remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

On Petition for Rehearing.

PER CURIAM.

A petition for rehearing has been filed in this case but it presents no question that has not already been fully considered. It is said that our decision is in conflict with our prior decision in Helvering v. Campbell, 139 F.2d 865, 870. We do not think so. The decision in that case was that deduction of the entire tax paid to the Philippine government for the tax year in question was not to be denied because certain items excluded in computing income under the federal income tax law were not excluded in computing the Philippine tax. The purpose of the exemption, as pointed out in our opinion, was to avoid double taxation; and where income tax has been paid on income for a given year to one of our possessions, it is a fair application of the principle involved to permit deduction of the tax so paid, irrespective of the basis upon which it has been computed, from the federal tax imposed upon income for the same year, since it is the income of the year which is subjected to taxation, not the various items of the income. No such reasoning is applicable, however, with respect to tax payments made within the year only because they were not made when due. If the language used in the Campbell case is broad enough to cover the case at bar, it is too broad and must be deemed limited to the facts of the case there under consideration.

Rehearing denied.