MARY A. MARSMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 18591.    Promulgated April 3, 1952.

*Clarence E. Musto, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

TURNER, *Judge:* The respondent determined deficiencies of $281,-811.72, $142,298.90 and $152,224.16 in the petitioner's income tax for 1939, 1940, and 1941, respectively, and a delinquency penalty of $70,452.93 for 1939.

On joint motion of the parties, an order was entered severing for preliminary determination in this proceeding and in the proceedings in Docket Nos. 18590 and 18592, involving deficiencies determined against the petitioner's husband, J. H. Marsman, and their daughter, Anne Petronella Marsman, for the years 1939, 1940, and 1941, the sole issue whether the petitioner, her husband and their daughter were, after April 28, 1939, residents of the United States during the years in question. At the hearing on that issue all questions involved in the proceeding of Anne Petronella Marsman were disposed by a stipulation of the parties. Following the hearing on such issue, it was determined that J. H. Marsman was at no time during the said years a resident of the United States, that until September 22, 1940, the petitioner likewise was a nonresident, and that beginning on that date and continuing through December 31, 1941, she was a resident. Pursuant to our determination as to the status of J. H. Marsman, decision was entered determining that there were no deficiencies in his income tax for the years in controversy.

In the case of Mary A. Marsman, three issues remain for determination. They are set out in a written stipulation filed by counsel at the hearing herein, and are (1) whether the income of petitioner and her husband both from individual services rendered by them and from their separately owned properties was community income taxable one-half to petitioner Mary A. Marsman, (2) whether the undistributed Supplement P net income for the entire year 1940 of petitioner's wholly owned foreign personal holding company, La Trafagona, is includible in full in her income for the period September 22 to December 31, 1940, or whether the amount to be so included is only that portion of the company's income attributable to the period September 22 to December 31, 1940, and (3) whether the petitioner is entitled to a credit against her 1941 Federal income tax of the income tax paid by her in that year to the Philippine Government on income for 1938 and that part of 1940 prior to September 22, during all of which she was a nonresident alien, and if the credit is not allowable, whether the Philippine income tax so paid is allowable as a deduction in determining her net income for 1941.

### GENERAL FINDINGS OF FACT.

A portion of the facts have been stipulated, and are found accordingly.

The petitioner is not and never has been a citizen of the United States. Prior to September 22, 1940, and as early as 1920, she was a resident of the Philippine Islands. She was not engaged in any way in trade or business within the United States at any time during 1939, 1940, or 1941. In 1939, she received dividends from sources within the United States in the sum of $1,332.50. Since it is not now ascertainable whether Federal income taxes were withheld from these dividends, the petitioner concedes that there is a deficiency of $133.25 in her Federal income tax for 1939 as a nonresident alien.

The only Federal income tax returns filed by the petitioner for 1940 and 1941 were nonresident alien returns on Treasury Department Forms 1040 NB.

### Issue 1. *Community Income.*

#### FINDINGS OF FACT.

The petitioner and J. H. Marsman were married in the Philippine Islands on September 8, 1920. They became naturalized citizens of the Philippines in 1934 and remained citizens thereof until the inauguration of the Commonwealth of the Philippines on November 15, 1935, whereupon they became citizens of the Commonwealth. They remained citizens of the Commonwealth and were domiciled therein until a time subsequent to January 1, 1942.

At the time of the marriage of the petitioner and J. H. Marsman, each owned separately a substantial amount of property and they entered into an oral agreement that the property thereafter acquired by each, including compensation derived from personal services as well as income derived from the separate property of each, was to remain the separate property of each spouse. This agreement has been observed by them since the date of their marriage. Separate bank accounts have been maintained in which the income of each, whether from investments or from personal services, has been deposited. Beginning not later than 1921 they have maintained separate accounts which reflect their individual investments and the income derived therefrom as well as their income from personal services.

As required by the income tax law of the Philippine Islands, the petitioner, J. H. Marsman, and their minor daughter, Anne Petronella Marsman, consolidated their incomes for each of the years 1938, 1939, 1940, and 1941 and filed joint Philippine income tax returns for each of the years. The return for 1941 was not filed on or before its due

date, March 1, 1942, because of the Japanese possession of the Philippines, but was filed after the cessation of hostilities.

Except for such adjustments as may be required as the result of this Court's determination of the issues involved herein, the deficiency notice mailed by the respondent to the petitioner correctly sets forth her gross income and losses, and allowable deductions and credits for the years 1939, 1940, and 1941.

In his determination of deficiencies against the petitioner and her husband for 1940 and 1941 the respondent determined that the petitioner's husband was taxable on the entire income from the property owned separately by him and on one-half of the combined earnings (salaries and director's fees) of himself and the petitioner, and that the petitioner was taxable on the entire income from the property owned separately by her and on one-half of the combined earnings of herself and her husband.

OPINION.

It is the claim of the petitioner that both the personal earnings of herself and her husband and the income from their separate properties were community income, only half of which was taxable to her. The respondent contends, on the other hand, that while the individual earnings of the petitioner and her husband were community income, the income from petitioner's separate property was her separate income. In the alternative, he contends that the oral antenuptial agreement was an effective agreement and that, by reason thereof, the income of each spouse from individual earnings and from separate property was his or her separate income. It thus appears that in order to win a greater over-all advantage on the basis of their respective contentions as to the status of the income of the petitioner and her husband from their separate properties, both petitioner and the respondent are willing to make concessions against interest as to the individual earnings of petitioner and her husband, and in the case of the respondent, we have as to such income the taking of contradictory primary and alternate positions.

The decision, in our opinion, must be for the petitioner. It is well settled that property and property rights are to be determined by the law [1] of the domicile of the parties. *Poe* v. *Seaborn*, 282 U. S. 101; *Helvering* v. *Campbell*, 139 F. 2d 865; and *Commissioner* v. *Cadwallader*, 127 F. 2d 547. According to the provisions of the Civil Code

---

[1] By stipulation the parties have set out in full those sections of the Civil Code of the Philippine Islands regarded by them as pertinent and have also stipulated that at all times material to the issues in this case the said sections "had not been amended or repealed" and further that the "said Code was in full force and effect as part of the fundamental law of the Philippine Islands."

of the Philippine Islands, the marital community is designated the conjugal partnership. Pursuant to the provisions of article 1401 of the code,[2] the property belonging to the conjugal partnership includes property acquired for valuable consideration during the marriage at the expense of the common fund; property obtained by the industry, wages, or work of the spouses; and "the fruits, income, or interest collected or accrued during the marriage, derived from the partnership property or from that which belongs separately to either of the spouses." The language of the code is clear, plain and unequivocal, and according to its terms, the income of the marital community includes the income from the separate property of the spouses. See and compare *Palanca* v. *Smith, Bell & Co.*, 9 Phil. 131; *Quison* v. *Salud*, 12 Phil. 109; *Marigsa* v. *Macabuntoc*, 17 Phil. 107; and *Bismorte* v. *Aldecoa & Co.*, 17 Phil. 480. The code further provides, however, that "Persons about to be joined in matrimony may, before entering into the marriage, establish by contract the conditions to which the conjugal partnership is to be subject with respect to their present or future property, subject only to the limitations prescribed by this code." It is then provided that in default of a contract relating to such property the marriage shall be deemed to have been contracted "under the regime of the legal conjugal partnership." It thus appears that, unless the oral antenuptial agreement was an effective contract under the code, both their individual earnings and the income from their separate properties were the income of the marital community.

In our opinion, the oral antenuptial agreement did not meet the requirements of the code and was not effective to make the earnings of each spouse and the income from the separate property of each his or her separate income. By article 1321 of the code, it is provided that antenuptial contracts and modifications thereof must be recorded "in a public instrument executed before the celebration of the marriage," unless the property dealt with is of the class referred to in article 1324. The property referred to in article 1324 consists of property other than real estate which does not exceed a total of 2,500 pesetas, in which case, if there is no notary in the town of their residence, the antenuptial contract may be executed before the secretary of the municipal council and two witnesses who have knowledge of the facts, and in such circumstances, the contract "shall be preserved, under registration, in the archives of the proper municipality." While

[2] ART. 1401. To the conjugal partnership belong:
1. Property acquired for a valuable consideration during the marriage at the expense of the common fund, whether the acquisition is made for the partnership or for one of the spouses only;
2. Property obtained by the industry, wages or work of the spouses or of either of them;
3. The fruits, income, or interest collected or accrued during the marriage, derived from the partnership property, or from that which belongs separately to either of the spouses.

the provisions do not in words say that the contract must be in writing, it is our opinion that a fair interpretation of the provisions of the code is that a contract in writing is the contract contemplated. In the law the word "instrument" commonly denotes a "document or writing." Bouvier's Law Dictionary, 3d rev., vol. 2, p. 1608; Black's Law Dictionary, 3d ed., p. 986; and Cyclopedic Law Dictionary, 3d ed., p. 586. Also the provisions of the Philippine Code relating to the formalities of the execution and the recording of antenuptial agreements as they appear in article 1321, or the preservation, under registration, in the archives of the proper municipality, under article 1324, support that conclusion. See also *Velasquez* v. *Biala*, 18 Phil. 231, wherein the court held, in applying article 1328, that contracts contained in private documents have no force whatever either between parties or as respects third parties, and further, that it was not enough that the act be recorded in writing even in a public document; "A public instrument, executed before a notary, is absolutely necessary." We accordingly conclude that the oral antenuptial agreement was ineffective and both the earnings of the two spouses and the income from their separate properties fall "under the regime of the legal conjugal partnership," belonging one-half to the petitioner and one-half to her husband.

### *Issue 2. Undistributed Net Income of La Trafagona.*

#### FINDINGS OF FACT.

La Trafagona was a corporation organized under the laws of the Philippine Islands sometime prior to 1938. At all times material herein it kept its books and filed its Philippine income tax returns on the basis of a calendar year.

Throughout the years 1938, 1939, 1940, and 1941, the entire outstanding capital stock of La Trafagona was owned by petitioner and during each of said years dividends and gains from securities transactions comprised more than 60 per cent of the corporation's gross income.

On December 31, 1940, La Trafagona's undistributed net income for the entire calendar year 1940 (computed under the provisions of Supplement P of the Internal Revenue Code for ascertaining "undistributed Supplement P net income" as said income is defined by section 335 of said Code) was $130,357.04.

In determining the deficiency for 1940 the respondent determined that the petitioner was subject to tax on the undistributed Supplement P net income of La Trafagona, that the amount thereof was $130,357.04 and included said amount in the petitioner's taxable income.

OPINION.

There is no controversy between the parties as to the status of La Trafagona as a foreign personal holding company in 1940, within the meaning of section 331 of the Internal Revenue Code. Furthermore, they are in agreement that the amount of La Trafagona's undistributed Supplement P net income for the entire calendar year 1940 was $130,357.04 as determined by the respondent. However, they are in disagreement as to the portion thereof that is to be included in the petitioner's income for her 101-day taxable period, September 22 through December 31, 1940, while she was a resident of the United States. The petitioner contends that for the purposes here La Trafagona was not a personal holding company at any time during 1940 prior to September 22 when she became a resident of the United States and that its income prior to that date could not, therefore, be taxed to her as the respondent has determined. She further contends that neither Supplement P of the Code nor the Committee Report with respect thereto indicates a Congressional intent to tax to her any income acquired by La Trafagona in 1940 prior to September 22. The respondent contends that since the petitioner was a resident of the United States during the period 1940 from September 22 to the end of the year she was subject to tax by the United States for the purposes of the provisions of Supplement P and that his determination that the undistributed Supplement P net income of La Trafagona for the entire calendar year 1940 was taxable to the petitioner was in accordance with the provisions of Supplement P, section 337.

Pertinent portions of the Internal Revenue Code are set out below.[3]

[3] SEC. 337. CORPORATION INCOME TAXED TO UNITED STATES SHAREHOLDERS.

(a) GENERAL RULE.—The undistributed Supplement P net income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States, domestic corporations, domestic partnerships, and estates or trusts (other than estates or trusts the gross income of which under this chapter includes only income from sources within the United States), who are shareholders in such foreign personal holding company (hereinafter called "United States shareholders") in the manner and to the extent set forth in this Supplement.

(b) AMOUNT INCLUDED IN GROSS INCOME.—Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the last day on which a United States group (as defined in section 331 (a) (2)) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend if on such last day there had been distributed by the company, and received by the shareholders, an amount which bears the same ratio to the undistributed Supplement P net income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year.

SEC. 331. DEFINITION OF FOREIGN PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this chapter the term "foreign personal holding company" means any foreign corporation if—

*     *     *     *     *     *     *

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals who are citizens or residents of the United States, hereinafter called "United States group".

The quoted provisions of sections 331 and 337 of the Code first appeared as part of section 201 of the Revenue Act of 1937 which amended the Revenue Act of 1936 by adding Supplement P relating to foreign personal holding companies. The provisions as quoted are substantially as they appeared in the Revenue Bill of 1937 as reported to the House from the Committee on Ways and Means and as finally enacted in the Revenue Act of 1937. The report on the Bill by the Committee on Ways and Means contained a detailed explanation of Supplement P and particularly of section 337 (a) (b).[4]

As indicated by the Committee Report the intent of Congress in enacting the provisions of Supplement P was to prevent the circumvention of tax obligations by citizens and residents of the United States and to forestall the future use of the "incorporated pocketbook" type of foreign corporation which had been employed for tax avoidance purposes. While it was recognized that the United States had no jurisdiction over such corporations, the objectives of the legislation were to be effected by requiring the corporations' shareholders, over

---

[4] H. Rept. No. 1546, 75th Cong., 1st Sess., pp. 13 to 23.  Respecting section 337 (a) and (b) the report contains the following:

NEW SECTION 337, 1936 ACT—CORPORATION INCOME TAXED TO UNITED STATES SHAREHOLDERS.

The undistributed supplement P net income of a foreign personal holding company is taxed to its United States shareholders under section 337.  *  *  *

Subsection (b) : The particular United States shareholders to be taxed upon the undistributed Supplement P net income of the foreign personal holding company are fixed by the stockholdings as of the last day of the company's taxable year on which more than 50 percent in value of its outstanding stock was owned by a United States group of five or less individuals.  *  *  *

The undistributed supplement P net income of the foreign personal holding company for its taxable year is taxed to the United States shareholders in the same ratio that the portion of the taxable year up to and including the last day on which the United States group existed bears to the entire taxable year.  Thus, if the United States group existed on the last day of the taxable year, the United States shareholders would return their pro-rata shares of the undistributed supplement P net income for the entire taxable year. But if the last day on which the United States group existed was on September 30, the United States shareholders would, if the taxable year was a calendar year, return only nine-twelfths of the undistributed supplement P net income for the entire taxable year. It will be observed that in the last case the calculation is based upon the undistributed supplement P net income for the entire taxable year and not merely upon the income received by the foreign company prior to September 30.  By this rule, all dividend distributions made by the foreign company are taken 'into account regardless of the day within the taxable year on which the last United States group existed.  If, in the last case, the current earnings had all been distributed after September 30, there would have been no undistributed supplement P net income to be returned by the United States shareholders who owned stock in the foreign company on September 30.

The pro-rata shares of the undistributed supplement P net income to be returned by the United States shareholders are treated as a dividend paid by the foreign company and received by the United States shareholders on the last day of the foreign company's taxable year on which the United States group existed.  *  *  *  Section 337 (b) expressly provides that the amounts returned by the United States shareholders as their pro-rata shares of the undistributed supplement P net income shall be treated as a dividend paid by the foreign company and a dividend received by the shareholders in order that such amounts will be given the same full force and effect as though the assumed distribution had actually been made by the foreign company.

In its application, section 337 reaches all United States shareholders who own stock in the foreign personal holding company on the specified day.  *  *  *

whom the United States did have jurisdiction, to report as their income the undistributed net income of such corporations. Such requirement was within the power of Congress to impose. *Eder* v. *Commissioner*, 138 F. 2d 27, affirming 47 B. T. A. 235 on this point; *Rodney, Inc.* v. *Hoey*, 55 F. Supp. 604.

From the provisions of section 337 (b) and of the Committee Report relating thereto it appears that where on the last day of a foreign personal holding company's taxable year one who has been its sole stockholder throughout such year and is also a citizen or resident of the United States on such day is required to include in his income as a dividend for the taxable year in which or with which the company's taxable year ends the full amount of the company's Supplement P net income which remains undistributed on the last day of its taxable year. There is nothing in Supplement P or in the Committee Report to indicate that such requirement or the amount of the undistributed net income is to be limited or restricted to the income of the company for the part of the company's taxable year that such stockholder was a resident or citizen of the United States. The fact that such sole stockholder was a resident of the United States on the last day of the company's taxable year is sufficient to subject him to the requirement of reporting as a dividend received the full amount of the company's undistributed net income for said year which remained undistributed on the last day of its taxable year.

If, in 1940 and prior to the time she became a resident of the United States, the petitioner, through the exercise of her absolute control over La Trafagona, had caused it to distribute all of its then undistributed 1940 net income, such income in her hands would not have been subject to tax by the United States, since that income would not have remained undistributed on the last day of the taxable year and at the time of its distribution she would have been a nonresident alien, not subject to tax by the United States on the said income. If, however, on December 31, 1940, she had caused La Trafagona to distribute, and thereby make available to her, all of its then undistributed 1940 net income, such income would have been subject to Federal income tax in her hands, because she then was a resident of the United States and subject to tax by it on her income. Compare *Ceska Cooper*, 15 T. C. 757. Consequently, since on December 31, 1940, it lay within her power to cause the distribution of the income and its actual receipt by her, Congress has not acted beyond its powers by requiring the petitioner to include such income in her gross income as a dividend.

We think the respondent's position on this issue is correct and it is accordingly sustained. The parties have stipulated the amount to be added to petitioner's income as the result of the conclusion stated.

## Issue 3. Philippine Income Taxes.

### FINDINGS OF FACT.

The joint Philippine income tax returns of petitioner, J. H. Marsman, and Anne Petronella Marsman for the calendar years 1938, 1939, 1940, and 1941, in which their incomes were consolidated, were filed on the cash basis. As required by the income tax law of the Philippine Islands, as amended in 1936, the tax for said years was computed upon the consolidated incomes of the spouses and their minor daughter. However, the law did not in terms provide who should be liable for the payment of the tax so computed. The Philippine income taxes so computed for 1938, 1939, and 1940 were paid by the petitioner, J. H. Marsman and Anne Petronella Marsman during the years and in the amount as follows:

| Taxable year | Amount in pesos | Year of payment |
|---|---|---|
| 1938: Original tax | 30, 616. 55 | 1939 |
| Deficiency | 265, 212. 87 | 1941 |
|  | 164. 09 | 1942 |
| 1939 | 448, 400. 19 | *1940 |
| 1940 | 198, 699. 12 | 1941 |

*Paid prior to Sept. 22.

The foregoing Philippine income taxes were "income taxes" within the meaning of sections 23 and 131 and all other sections of the Internal Revenue Code. No portion of such taxes has been refunded.

At all times material hereto the Philippine Islands were a "possession of the United States" for purposes of sections 23, 131, and all other sections of the Internal Revenue Code. The rate of exchange between the Philippine peso and the United States dollar was fixed at two pesos for one dollar at all times pertinent herein.

The amount of Philippine income taxes paid or accrued by the petitioner on income received during any one of the calendar years 1938, 1939, and 1940 was that proportion of the total tax paid or accrued by petitioner, J. H. Marsman, and Anne P. Marsman jointly upon their consolidated income of such year, as shown above, as the income determined in this proceeding to be attributable to the petitioner for such year bears to the consolidated income of petitioner, J. H. Marsman, and Anne Petronella Marsman for such year. The total of said consolidated income for 1938 was 339,523.44 pesos. The totals for 1939 and 1940 are correctly set forth in the notice of deficiency to the petitioner.

The petitioner has never filed claim for credit of foreign income taxes on Treasury Department Form 1116 and so far as disclosed has

never claimed the Philippine income taxes involved herein either as credits or as deductions in any Federal income tax returns filed for the years here involved. In determining the deficiencies herein the respondent allowed no credit on account of Philippine income taxes paid by petitioner because of lack of proof to substantiate an allowance. Nor did respondent allow any deduction on account of such taxes.

OPINION.

As to the claim for credit against tax of the Philippine income tax or in the alternative for deduction thereof from gross income, our inquiry is now limited to the year 1941. The claim for 1939 was disposed of by our determination that petitioner during that year was a nonresident alien, and due to the fact that she paid her 1939 Philippine income tax in 1940 prior to September 22, when she became a resident of the United States she has abandoned her claim for 1940.

Petitioner's primary contention is that under the provisions of section 131 of the Internal Revenue Code,[5] she is entitled to credit against her 1941 Federal income tax, the 1938 and 1940 Philippine income tax

---

[5] SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

(a) ALLOWANCE OF CREDIT.—If the taxpaper chooses to have the benefits of this section, the tax imposed by this chapter, except the tax imposed under section 102 or section 450, shall be credited with:

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

(2) RESIDENT OF UNITED STATES.—In the case of a resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and

(3) ALIEN RESIDENT OF UNITED STATES.—In the case of an alien resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any foreign country, if the foreign country of which such alien resident is a citizen or subject, in imposing such taxes, allows a similar credit to citizens of the United States residing in such country:    *    *    *

*         *         *         *         *         *         *

(b) LIMIT ON CREDIT.—The amount of the credit taken under this section shall be subject to each of the following limitations:

(1) The amount of the credit in respect to the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources within such country bears to his entire net income, in the case of a taxpayer other than a corporation,    *    *    *    for the same taxable year;    *    *    *

*         *         *         *         *         *         *

(d) YEAR IN WHICH CREDIT TAKEN.—The credits provided for in this section may, at the option of the taxpayer and irrespective of the method of accounting employed in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued, subject, however, to the conditions prescribed in subsection (c) of this section. If the taxpayer elects to take such credits in the year in which the taxes of the foreign country or the possession of the United States accrued, the credits for all subsequent years shall be taken upon the same basis, and no portion of any such taxes shall be allowed as a deduction in the same or any succeeding year.

paid by her in 1941, and a literal interpretation of the provisions of that section, standing alone, would seem to support that claim. Any provision of a given statute must be read, however, in conjunction with the other provisions of the statute, keeping in mind the purpose for which the statute or the particular provision thereof was enacted. And where the language of a provision, standing alone, would produce results plainly at variance with the purpose of the legislation as a whole, the Supreme Court has said that such purpose, rather than the literal wording of the provision, should be followed. *United States* v. *American Trucking Associations, Inc.*, 310 U. S. 534. In that case the Supreme Court, in its opinion, at pages 543 and 544, said:

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." * * *

See also *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377; *United States* v. *Dickerson*, 310 U. S. 554, 562; *Haggar Co.* v. *Helvering*, 308 U. S. 389; *Gregory* v. *Helvering*, 293 U. S. 465; *Helvering* v. *New York Trust Co.*, 292 U. S. 455.

Prior to the enactment of the Revenue Act of 1918, income taxes paid by citizens and residents of the United States to foreign countries were available only as deductions from gross income. By section 222 of that Act, such taxes became available for the first time as credits against the tax. As indicated by the terms of that section, as well as the committee reports relating thereto, the primary purpose of the section was to mitigate the burden theretofore existing by reason of the same income being taxed twice, once by the foreign country or possession in which it was derived and again by the United States.[6] Although the original provisions relating to such credit have been changed in some respects by subsequent enactments, the purpose prompting the allowance in the Revenue Act of 1918 has been recognized as continuing in subsequent legislation. *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1; *American Chicle Co.* v. *United States*, 316 U. S. 450; *Hubbard* v. *United States* (Ct. Cl.), 17 F. Supp. 93, certiorari denied 300 U. S. 666; *Jules D. Lederman*, 6 T. C. 991; *L. Helena Wilson*, 7 T. C. 1469.

---

[6] H. Rept. No. 767, 65th Cong., 2d Sess., p. 11; H. Rept. No. 1037, 65th Cong., 3d Sess. (Report—Conference Committee), p. 53.

For the purposes herein, the Philippine Islands were at all times material a possession of the United States. In section 251 of the Internal Revenue Code, Congress has legislated in great detail as to the liability "of citizens of the United States or domestic corporations" for tax on income from sources within possessions of the United States. Immediately following, in section 252 (a) of the Code,[7] it has provided that any individual who is a citizen of a possession of the United States but not otherwise a citizen of the United States and who is not a resident of the United States shall be subject to taxation only as to income from sources within the United States, "and in such case the tax shall be computed and paid in the same manner and subject to the same conditions as in the case of other persons who are taxable only as to income derived from such sources." "Other persons who are taxable only as to income derived" from sources within the United States are nonresident alien individuals. Section 212 (a) of the Internal Revenue Code; see also section 29.252-1, Regulations 111.

Admittedly, the petitioner's income for the year 1938, for the tax on which credit is here claimed, was Philippine income subject only to the Philippine income tax, and there was no double taxation of that income, and during that year she was, for Federal income tax purposes, a nonresident alien. Similarly, by reason of our prior decision herein that she was not a resident of the United States until September 22, 1940, there is no double taxation of her Philippine income for 1939 or of similar income realized in 1940, prior to September 22 of that year. In so far, therefore, as the claim of credit of the Philippine income tax paid on such income is concerned, the claim goes beyond the recognized and established purpose of the statute, in view of the fact that the tax sought to be credited was the tax on the income of a person taxed as a nonresident alien, which income was not subject to tax by the United States at all. Accordingly, if the petitioner is to prevail, it must be because the wording of the statute is such that it lends itself to no reasonable interpretation other than that contended for by petitioner, and for that reason it is to be presumed that Congress intended it to be applied even though it did result in an allowance over and above the purpose sought to be accomplished.

As already noted, however, the tax sought to be credited was a tax on the income of the petitioner realized from sources without the United States and, as in the case of a nonresident alien under section 212, that income was not subject to Federal income tax. With respect

---

[7] SEC. 252. CITIZENS OF POSSESSIONS OF UNITED STATES.

(a) Any individual who is a citizen of any possession of the United States (but not otherwise a citizen of the United States) and who is not a resident of the United States, shall be subject to taxation under this chapter only as to income derived from sources within the United States, and in such case the tax shall be computed and paid in the same manner and subject to the same conditions as in the case of other persons who are taxable only as to income derived from such sources.

to such income and the allowances to be made under section 131 for the tax paid thereon, Congress has legislated specifically. In section 216 of the Code, it is provided that "A nonresident alien individual shall not be allowed the credits against the tax for taxes of foreign countries and possessions of the United States allowed by section 131." In view, therefore, of the recognized and established purpose of section 131, *supra*, and the plainly declared prohibition against the allowance of such credits to a nonresident alien individual as this petitioner was for the year 1938, and that part of 1940 prior to September 22, it is our view that she does not, under section 131, become entitled to credit for the tax on income realized during the period of her status as a nonresident alien by later becoming a resident and then paying the tax on such nonresident alien income. The application of section 131 must be in harmony with other provisions of the statute and must be made with regard to its recognized and established purpose.

The respondent cites and relies upon *Hubbard* v. *United States, supra*, and *L. Helena Wilson, supra*, whereas the petitioner cites and relies on *I. B. Dexter*, 47 B. T. A. 285, and *Helvering* v. *Nell*, 139 F. 2d 865, contending that while *Hubbard* v. *United States, supra*, does support the respondent, it is in conflict with *I. B. Dexter, supra*, decided by this Court, and that this latter case must be overruled if the respondent is to be sustained. As to *L. Helena Wilson, supra*, it is the position of the petitioner that because of our holding that the Canadian tax there sought to be credited was not in nature and character an income tax, that case is not in point.

Regardless of whether the views of the Court of Claims expressed in *Hubbard* v. *United States, supra*, are in conflict with *I. B. Dexter, supra*, and *Helvering* v. *Nell, supra*, those cases are not this case. There the taxpayers at all times pertinent were citizens or residents [8] of the United States. Here the petitioner, during the periods in which the income was realized and the tax sought to be credited attached, was an alien and a nonresident of the United States and, as to her, the statutory provisions relating to nonresident aliens applied and there was, as in the case of any other nonresident alien as to income from sources without the United States, no problem or question of double taxation. To remove any question of credit, however, Congress, in section 216, *supra*, specifically barred the allowance of credit for the income tax paid thereon to [the Philippines] a possession of the United States. It would be strange construction, indeed, to hold, with respect to the Philippine income tax for 1938 and that part of the 1940 tax allocable to income realized in 1940 prior to September 22, and by reason of peti-

---

[8] The petitioners in *I. B. Dexter* were husband and wife and were shown to be residents of Oregon. The report in the case does not show whether they were also citizens of the United States.

tioner's subsequent change of status from nonresident alien to resident alien, not only that section 216 was thereby rendered inapplicable but that, under section 131, *supra*, petitioner, through her own delinquency in the payment of her 1938 Philippine income tax and for the purpose of avoiding a double tax, is entitled to a credit to which she would not have been entitled if her said Philippine income tax had been paid when it was due and payable, and even though there was not in the first instance any double tax to be avoided.

It may be noted in passing that Congress has taken steps to see that an alien taxpayer, on a cash basis, may avoid loss of the tax credit to which he is entitled under section 131, *supra*, when his status is changed back from that of a resident to that of a nonresident prior to the time the foreign income tax on the double taxed income is paid.   Under the provisions of section 131 (d), a taxpayer entitled to the credit may, at his option and irrespective of his method of accounting, take the credit in the year in which the taxes of the foreign country or possession of the United States accrued.[9]   It is thus apparent that the petitioner might, if she had so chosen, have claimed credit of that portion of her 1940 Philippine income tax allocable to income realized in that year and after September 22 against her 1940 income tax to the United States, and a credit against her 1941 income tax to the United States of whatever amount of 1941 Philippine income tax for which she was liable.   On brief, she has made some argument that if her claim is not allowable on the basis of Philippine income tax actually paid in 1941, as claimed, she should be allowed credit on an accrual basis.   The facts of record, however, fail to show what the amount of her 1941 Philippine income tax liability was, if any, and in the absence of such a showing, any claim for credit of 1941 Philippine income tax must fail. Whether or not on this state of facts the petitioner would elect, under section 131 (d), *supra*, to take the credit of her 1940 Philippine income tax to the extent here found allowable against her 1940 income tax to the United States or against her 1941 Federal income tax as contended for in this proceeding, we do not know.

We accordingly conclude and hold that the petitioner, under section 131, *supra*, is entitled as a credit against her Federal income tax for 1941 of only that part of her Philippine income tax for 1940 allocable to the 1940 income realized after September 22, when she became a resident of the United States, and is not entitled to credit for her 1938 Philippine income tax paid in 1941 nor the Philippine income tax paid in 1941 which was allocable to her 1940 income prior to September 22.

---

[9] It is to be noted that in the *Dexter* case the petitioners "duly signified their desire to receive the benefit of the provisions of section 131 on the accrual basis" and that the Philippine income tax sought to be credited was for a year when the petitioners were residents of the United States and not an alien nonresident, as was the petitioner here.

16

In the alternative, the petitioner contends that if the deficiency in Philippine income tax for 1938 and the Philippine income tax for 1940 allocable to income realized by her prior to September 22, 1940, while she was still a nonresident, are held not to be available as credits against her Federal income tax for 1941, they are allowable as deductions under section 23 of the Internal Revenue Code in computing her 1941 net income for Federal tax purposes. Under section 23 (c) (1) of the Code, provision is made generally for deduction of taxes paid or accrued within the taxable year, except that under subsection (C), income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States are not deductible "if the taxpayer chooses to any extent the benefits of section 131." [10] The limitation of the deductions as provided in subsection (C) would on its face appear to bar the deduction of the taxes claimed, since in the instant case the petitioner not only has chosen to take the benefits of section 131, but to the extent of the Philippine income tax allocable to that part of her 1940 income realized after September 22, while she was a resident of the United States, her claim of benefit under section 131 has been allowed. Such an interpretation of the provision is in harmony with its declared purposes, as stated at page 132 of the Report of the Senate Finance Committee [11] on the bill which became the Revenue Act of 1942. The provision in question first came into the Code as a part of the Revenue Act of 1942 and the report of the Finance Committee explaining the provision states that if the claim of credit for foreign tax is allowed to any extent, then under the provision in question, no portion of such tax can be allowed as a deduction.

In addition to the above, there is a further reason why we think the petitioner's claim of deduction may not be allowed. Under section 24 (a) (5) of the Code,[12] it is provided that in computing net

---

[10] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

* * * * * * *

(c) TAXES GENERALLY.—
 (1) ALLOWANCE IN GENERAL.—Taxes paid or accrued within the taxable year, except—

 * * * * * * *

 (C) income, war-profits, and excess-profits taxes imposed by the authority of any foreign country or possession of the United States, if the taxpayer chooses to take to any extent the benefits of section 131.

[11] S. Rept. No. 1631, 77th Cong., 2d Sess., p. 132.

[12] SEC. 24. ITEMS NOT DEDUCTIBLE.
(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

* * * * * * *

(5) Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this chapter, or any amount otherwise allowable under section 23 (a) (2) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this chapter.

income, no deduction shall in any case be allowed in respect of "Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest * * * or any amount otherwise allowable under section 23 (a) (2) which is allocable to interest * * * wholly exempt from the taxes imposed by this chapter." With respect to the applicability of section 24 (a) (5), the petitioner contends that the exempt income there referred to means income which is exempt because Congress, by specific provision of the statute, has exempted that income. It would be difficult, we think, to conceive of a more effective statutory exemption from Federal income tax of the income on which the Philippine income tax here in question was paid than is provided by the provisions of section 252 (a), *supra*. Whether or not due to particular status of the Philippines at the time and that of its citizens who were not citizens or residents of the United States there may have been other reasons why an exempt status may have been claimed for the income in question, we find it unnecessary to consider. The claim of the petitioner is accordingly denied.

Reviewed by the Court.

*Decision will be entered under Rule 50.*