SILVIO GUTIERREZ, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5958–66.    Filed December 18, 1969.

*Herrick K. Lidstone* and *Carl B. Cordes*, for the petitioner.
*James Q. Smith* and *Stanley J. Goldberg*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined a deficiency of $88,146.71 in the income tax of petitioner for the year 1961.

In his reply brief respondent has conceded that accrued bond interest of $52,751.31 need not be included in the gross income of either petitioner or Gulf Stream Investment Co., Ltd., his foreign personal holding company. Thus the two issues remaining for decision are: (1) Whether under section 551(b), I.R.C. 1954,[1] petitioner, a resident alien, must include in his gross income the entire amount of Gulf Stream's undistributed foreign personal holding company income for its fiscal year ended August 31, 1961, or only 184/365 of such income, where petitioner did not become a resident of the United States until March 1, 1961; and (2) whether Gulf Stream is entitled to a deduction of $16,007 for alleged bad debts or to a reserve therefor. The determination of these issues will also affect the amount which petitioner may deduct for medical expenses under section 213.

The facts of this case have been fully stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Silvio Gutierrez (herein called petitioner) has been at all times and is now a citizen of Venezuela. He was a resident of Venezuela at the time he filed his petition in this case.

Petitioner filed his Federal income tax return for 1961 with the district director of internal revenue for the Manhattan District of New York. The return was prepared on a cash receipts and disbursements basis for the calendar year.

Prior to March 1, 1961, petitioner was a nonresident alien of the United States. Petitioner became a resident alien of the United States on March 1, 1961.

Gulf Stream Investment Co., Ltd., a Bahamian corporation, was incorporated on September 1, 1951, and derived all of its income from investments during its fiscal year ended August 31, 1961. Petitioner was Gulf Stream's sole stockholder for the entire 1961 fiscal year and through December 31, 1961.

Gulf Stream at all relevant times maintained its books on the accrual method of accounting and on the basis of a fiscal year ending September 1 which for purposes of this case shall be considered a fiscal year ended August 31.

Gulf Stream's profit and loss statement for the fiscal year ended August 31, 1961, contained a figure of $94,045 for loans to five Venezuelan individuals. The statement also creates a reserve of $16,007 for

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

"doubtful loans." Notes signed by the five persons show that the loans were made on February 1, 1960, and were due on February 1, 1961. No principal or interest was paid on any of these loans through August 31, 1968.

The report of Gulf Stream's auditors dated March 30, 1962, stated that they had not received direct confirmation of the loans from the borrowers. Although the notes provided for extension of the loans, none was ever extended.

In 1961 petitioner paid $639.85 for medicines and drugs and $1,329.90 for other medical and dental expenses for himself and his family.

On his 1961 Federal income tax return petitioner reported Gulf Stream's taxable undistributed income for the year ended August 31, 1961, as $113,645.50. Petitioner now seeks to reduce this amount by $16,007, the amount of the reserve for bad debts which appears on Gulf Stream's income statement. On his return petitioner also included in his income only that ratable portion (184/365) of Gulf Stream's income which was earned after he became a resident alien.

1. *Amount of Undistributed Foreign Personal Holding Company Income Includable in Petitioner's Gross Income.*—Respondent has included in petitioner's gross income for 1961 all of Gulf Stream's taxable income for its fiscal year ended August 31, 1961. In doing so, respondent has relied on a literal interpretation of section 551(b),[2] which includes in petitioner's gross income the amount he would have received if Gulf Stream had distributed its 1961 taxable income as a dividend on August 31, 1961.

Petitioner disagrees with respondent's determination on the ground that he was a nonresident alien until March 1, 1961, and that income earned by his foreign personal holding company before that date should not be taxed. He does not question the power to tax such income. He simply argues that Congress did not intend to tax it.

---

[2] SEC. 551. FOREIGN PERSONAL HOLDING COMPANY INCOME TAXED TO UNITED STATES SHAREHOLDERS.

(a) GENERAL RULE.—The undistributed foreign personal holding company income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States, domestic corporations, domestic partnerships, and estates or trust (other than estates or trusts the gross income of which under this subtitle includes only income from sources within the United States), who are shareholders in such foreign personal holding company (hereinafter called "United States shareholders") in the manner and to the extent set forth in this part.

(b) AMOUNT INCLUDED IN GROSS INCOME.—Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the last day on which a United States group (as defined in section 552(a)(2)) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend (determined as if any distribution in liquidation actually made in such taxable year had not been made) if on such last day there had been distributed by the company, and received by the shareholders, an amount which bears the same ratio to the undistributed foreign personal holding company income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year.

The foreign personal holding company provisions originated in section 201 of the Revenue Act of 1937.[3] They were designed as a response to the rapidly growing problem of foreign "incorporated pocketbooks." Citizens and residents normally subject to the taxing power of the United States were postponing or avoiding taxation through the use of foreign holding companies not directly within the jurisdiction of our tax laws.[4] Under the new provisions the corporate income was reached by taxing the U.S. shareholders as if the income had been received by them as dividends.

Prior to March 1, 1961, petitioner was a nonresident alien, wholly free of U.S. jurisdiction over citizens and resident aliens. He was not avoiding U.S. taxes; he was not subject to them. He argues that his entry into this country should not bring his previously earned income within the scope of a provision aimed at preventing U.S. citizens and residents from avoiding tax.

Petitioner also argues that section 551(b), at least under certain circumstances, "clearly contemplates allocation of a foreign personal holding company's income between the period when a United States group existed and the period during which a United States group did not exist." If petitioner had been a resident alien prior to March 1, 1961, and had returned to Venezuela on that date, he would be taxable only on Gulf Stream's income up to that point. Thus petitioner maintains that the fact that his period of residency occurred in the last half of Gulf Stream's fiscal year, instead of the first half, does not warrant a different result.

Finally, petitioner contends that section 551(b), if literally construed, operates merely as a trap for the unwary. It was within petitioner's power to cause a distribution of Gulf Stream's income from September 30, 1960, to March 1, 1961, before he became a resident alien subject to our jurisdiction. Under those circumstances the income would not have been taxed as undistributed foreign personal holding company income. It is therefore asserted that Congress did not intend to tax only the unwary, particularly if they are aliens unfamiliar with our tax laws.

Section 551(b) taxes undistributed foreign personal holding company income to the citizen or resident who holds the shares on "the last day in which a United States group * * * existed." He is taxed on all the company income from its fiscal year unless the U.S. group ceased to exist before the end of that year. In taxing the last holder on earnings for the full year, the provision avoids the problem of allocating earnings to various taxpayers when the shares have changed hands. The successive shareholders are able to adjust their

---

[3] Sec. 331–341, I.R.C. 1939.
[4] H. Rept. No. 1546 to accompany H.R. 8234, 75th Cong., 1st Sess., p. 13–14.

transactions to reflect the anticipated tax. Compare section 1373(b) which taxes the last-day shareholder of a subchapter S corporation. Although neither the legislative history of section 551(b) nor that of section 1373(b) contains any discussion of the attributed yearend dividend device, the effect is indicative of a purpose to collect the total tax from one taxpayer rather than from many. Use of the device in otherwise unrelated sections negates the likelihood that it serves some purpose peculiar to foreign personal holding companies. It thus appears that petitioner has indeed been snared in statutory language directed not at newly arrived resident aliens, but rather at a situation where the shares have changed hands.

We find petitioner's arguments appealing, even though this is not an issue of first impression for this Court. In an identical case we chose to follow the equivalent language of section 337(b) of the 1939 Code. *Mary A. Marsman*, 18 T.C. 1, 6-9 (1952). Our decision was reversed by the Court of Appeals for the Fourth Circuit, which noted that a literal interpretation of section 337(b) would produce the same result if the taxpayer had become a resident alien for only the last day of the year. The Court of Appeals said: "We cannot attribute to the Congress of the United States the intent to accomplish such an extraordinary result." *Marsman* v. *Commissioner*, 205 F. 2d 335 (C.A. 4, 1953).

Petitioner contends that by enacting the 1954 Code without changing the relevant language Congress has given its approval to the opinion of the Fourth Circuit. However, we find nothing in the legislative history of the reenactment to indicate that Congress was aware of either *Marsman* opinion.

Since the *Marsman* reversal we have persisted in our literal approach to section 337(b), the predecessor of section 551(b). See *Ellsworth C. Alvord*, 32 T.C. 1, 22 (1959), where this Court said:

It may well be, as petitioners contend, that to so hold produces a harsh result. However, we do not think that fact warrants us in giving the statute a construction which does not seem warranted by what seems to be its plain meaning. See *Phanor J. Eder*, 47 B.T.A. 235, reversed on another point *Eder* v. *Commissioner*, 138 F. 2d 27. We think, if the result be harsh, that the remedy is within the province of Congress to enact a change in the law and that it is not within our province to change it by construction.

That case involved a U.S. citizen who received shares of a foreign personal holding company from a nonresident alien, and who was denied permission by the Commissioner to distribute the company income to himself because of a prior tax lien on the shares. The Court of Appeals for the Fourth Circuit again rejected our literal approach to the statute, holding that Congress did not intend to impose the tax where the taxpayer had tried to cause a distribution. *Alvord* v. *Com-*

*missioner*, 277 F. 2d 713 (C.A. 4, 1960). This result nullified our opinion on the issue of whether the earnings which accrued while the shares were in the hands of a nonresident alien were taxable.

In 1962 Congress enacted provisions of the 1954 Code regarding controlled foreign corporations (subpart F) which bear a general resemblance to the foreign personal holding company provisions. However, section 951(a)(2)(A), unlike section 551(b), requires the year-end shareholder to include in gross income his share of only "an amount (i) which bears the same ratio to [the corporation's] subpart F income for the taxable year, as (ii) the part of such year during which the corporation is a controlled foreign corporation bears to the entire year." Section 951 treats U.S. shareholders of controlled foreign corporations in the manner which petitioner would have section 551 treat U.S. shareholders of foreign personal holding companies.

It can be argued that the difference in language between sections 951(a)(2)(A) and 551(b) supports the opinion of this Court in *Marsman*. Bureau of National Affairs, Tax Management No. 103, Foreign Personal Holding Companies, p. A–33 (1965). Congress, the argument goes, was aware of the problem with section 551(b) when it wrote section 951(a)(2)(A), and it would have rewritten section 551(b) at the same time if it wished. Since it did not, the difference is intentional, and literal interpretation of section 551(b) is required.

In our opinion there are several weaknesses in this argument. First, it assumes that the congressional committees which wrote the new 1962 legislation were interested in rewriting section 551(b) at the same time, and that the task was a simple one. More likely their focus was confined to the problem at hand, i.e., the drafting of new legislation instead of perfecting old. Second, the argument assumes that Congress was aware of the *Marsman* opinions in 1962 but not in 1954. If Congress was aware in 1954, then reenactment of the language of the 1939 Code suggests approval of the language as construed by the Court of Appeals for the Fourth Circuit. Third, if Congress regarded the opinion of the Court of Appeals as correct, then there was no need to rewrite section 551(b). At best, we think the legislative history is inconclusive. However, we are inclined to the view that in writing section 951(a)(2)(A) Congress avoided the problem of the language of section 551(b) entirely, choosing to write new language to achieve a more certain result, and, in effect, stating the correct rule. Since section 951 was enacted to serve a purpose under the controlled foreign corporation provisions substantially identical to that served by section 551 under the foreign personal holding company provisions, we believe section 951(a)(2)(A) offers a strong indication of how Congress intended section 551(b) to operate.

For the reasons stated herein, we now accept the views of the Court of Appeals and we will no longer follow our earlier decision in the *Marsman* case on this issue. As the Supreme Court said in *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534, 543–544 (1940) :

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When the meaning has led to absurd or futile results, however, this Court has looked beyond the words of the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

Accordingly, we, like the Court of Appeals, apply those principles in this case and hold that under the provisions of section 551(b) petitioner must include in his gross income for 1961 only 184/365 of Gulf Stream's taxable income for its fiscal year ended August 31, 1961.

2. *Claimed Deduction to Bad Debt Reserve.*—Petitioner's return for 1961 failed to take into account the $16,007 bad debt reserve appearing on the income statement of Gulf Stream. Petitioner now claims that Gulf Stream, and ultimately petitioner, should be allowed a deduction for that amount.

Respondent contends that petitioner has not shown tha the $94,045 repersented bona fide debts, that the reserve amount was reasonable, or that any loan became worthless in Gulf Stream's fiscal year ended August 31, 1961. In addition, respondent contends that because Gulf Stream is not a taxpayer reporting charge sales and having large amounts of notes and accounts receivable, it is ineligible to use of the reserve method.

We think respondent properly disallowed the amount as a reserve for bad debts. Petitioner has not shown that bona fide debts existed between the five Venezuelans and Gulf Stream. Sec. 1.166–1(c), Income Tax Regs. It is highly unlikely that Gulf Stream could have loaned such large sums of money to five different individuals and not have received a cent of interest or principal from any of them. On the record we can only conclude that the amounts were never intended to be repaid.

Even assuming that bona fide debts existed, the Commissioner, in the exercise of the discretion granted him by section 166(c), could properly conclude that Gulf Stream was not entitled to use the reserve

method. I.T. 1644, II–1 C.B. 99; cf. sec. 1.166–4(c), Income Tax Regs.

Accordingly, we sustain respondent on this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

QUEALY, *J.*, dissenting: I respectfully dissent from the holding of the majority that the petitioner is not required to include in his gross income the entire amount of the undistributed foreign personal holding income of Gulf Stream for its fiscal year ended August 31, 1961. In my opinion, section 551(b) clearly requires the inclusion of the entire amount of such income in the petitioner's return and there is no reason to depart from the clear and concise requirement of the statute. We so held in *Mary A. Marsman*, 18 T.C. 1 (1952), revd. 205 F. 2d 335 (C.A. 4, 1953), and in *Ellsworth C. Alvord*, 32 T.C. 1 (1959), revd. 227 F. 2d 713 (C.A. 4, 1960).

While our opinion with respect to this issue in the *Marsman* case was reversed by the Court of Appeals for the Fourth Circuit, up until now we have been unwilling to follow the decision of the appellate court in that case. In *Alvord*, 32 T.C. 1, 21–22,[1] this Court said:

> The Commissioner in his brief in the instant case relies upon our decision in the *Marsman* case but contends, assuming the correctness of the Fourth Circuit's reversal of the *Marsman* case, that nevertheless it is not controlling here because it is distinguishable on its facts. It is the feeling of our Court that the Court of Appeals for the Fourth Circuit, if this case is appealed, may want to consider the alternative issue in the light of the factual situation in the present case as compared to that in *Marsman* v. *Commissioner, supra,* and with that in mind the Tax Court will not decide this case for the petitioner on the reversal of the *Marsman* case. We will decide it on what we conceive to be the meaning of the statute.
>
> Section 337(b) provides:
>
> "(b) AMOUNT INCLUDED IN GROSS INCOME.—Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the *last* day on which a United States group (as defined in section 331(a)(2)) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend if on such last day there had been distributed by the company, and received by the shareholders, an amount which bears the same ratio to the undistributed Supplement P net income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year. [Emphasis supplied.]"
>
> As we have heretofore said, it has been stipulated that on September 8, 1951, petitioner became the owner and holder of 9,500 shares of Hekor's stock out of 10,000 outstanding shares and owned it throughout the periods here in question. Therefore, we think that under the terms of the statute just quoted petitioner is taxable on 95 per centum of Hekor's undistributed Supplement P income for the year 1951. We so hold. It may well be, as petitioners contend, that to so hold

---

[1] While the Court of Appeals for the Fourth Circuit also reversed our decision in the *Alvord* case, that reversal was based primarily on the grounds of quasi-estoppel.

produces a harsh result. However, we do not think that fact warrants us in giving the statute a construction which does not seem warranted by what seems to be its plain meaning. See *Phanor J. Eder*, 47 B.T.A. 235, reversed on another point *Eder* v. *Commissioner*, 138 F. 2d 27. We think, if the result be harsh, that the remedy is within the province of Congress to enact a change in the law and that it is not within our province to change it by construction.

Nothing has transpired since our decision in the *Alvord* case, and there are no peculiar facts in this case which would warrant a change of opinion on our part with respect to this issue. The fact that the Congress in 1962 adopted a different rule in section 951(a) (2) (A) from the rule in section 551(b) can only be construed as an indication that the Congress intended to achieve a different result in each. The basic statute with which we are here concerned was first enacted as a part of the Revenue Act of 1937[2] in an atmosphere entirely different than that which prevailed when Congress enacted section 951(a) (2) (A) in 1962. It was an avowed intention of the administration in office in 1937—as well as of the Congress—to legislate foreign personal holding companies out of existence. In support of this legislation, a special committee of the Congress stated:[3]

There appears to be no justification for the continued existence of foreign personal holding companies owned by American citizens or residents and it is believed that practically all of such companies have been created with the sole purpose of avoiding or evading the imposition of the surtax on their shareholders. It is believed as a matter of fiscal policy that the dissolution of such companies should be effected as promptly as possible * * *

There is a marked contrast with the attitude prevailing at the time of the enactment of the Revenue Act of 1962, which included sections 951 through 964 (subpart F) of the Internal Revenue Code of 1954.

Neither the legislative history nor the facts in this particular case warrant a departure from the rule that where there is no ambiguity a statute should be applied as it was written and not as the court may think that it should have been written. *Hatfried, Inc.* v. *Commissioner*, 162 F. 2d 628 (C.A. 3, 1947); *Caldwell* v. *United States*, 114 F. 2d 995 (C.A. 3, 1940). There is no reason to believe that the result in this case, albeit it "harsh," was not that intended by the Congress. There is nothing "absurd" or "futile" about that result. Accordingly, there is no basis for this Court to rewrite the statute. Cf. *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534 (1940).

RAUM and WITHEY, *JJ.*, agree with this dissent.

---

[2] Sec. 337(b).

[3] Report of the Joint Committee on Tax Evasion and Avoidance of the Congress of the United States, H. Doc. No. 337, 75th Cong., 1st Sess., p. 21 (1937).